CHABERT, PETICIONARIO Y APELANTE, *v.* SÁNCHEZ, RECURRIDO Y APELADO.

APELACIÓN procedente de la Corte de Distrito de San Juan, Sección Primera, en procedimiento de *habeas corpus.*

No. 2197.—Resuelto en marzo 28, 1921.

HABEAS CORPUS—PATRIA POTESTAS—BIENESTAR DEL MENOR.—Aunque los padres tienen generalmente derecho a la custodia de sus menores hijos, tal derecho no es absoluto y una petición de *habeas corpus* para obtener la custodia de

un hijo menor, que es, por su naturaleza, un remedio en equidad, está diri-
gida a la sana discreción del tribunal, dentro de cuya discreción el factor
principal a considerar es el bienestar del menor.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. M. Acosta.*

Abogado del apelado: *Sr. E. Acuña.*

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del
tribunal.

El peticionario interpone recurso de apelación contra una
sentencia dictada contra él en procedimientos para obtener la
custodia de una niña de seis años de edad a la fecha del juicio.

Para los fines de esta opinión será bastante con hacer la
siguiente cita del resumen hecho por el juez sentenciador:

"'No es posible ocultar que ante la corte se presenta ahora un
difícil y grave problema. Es cierto que se trata de un caso sensa-
cional, y con apariencia de extraordinario. Si el juez que resuelve
este asunto sintiera temor ante la ola de opinión, y no solamente el
recto temor a Dios y a su conciencia, su situación sería sumamente
embarazosa, puesto entre las encontradas y rigurosas corrientes de
opiniones diversas y adversas entre sí, que si no pueden llegar al
fuero de su conciencia, es inevitable que lleguen a sus oídos, ya que
no es el juez una roca en el océano, sorda al grito del oleaje, y ciega
a la luz del sol. La única virtud que al juzgador se exige es la de
no permitir en ocasión alguna, que su opinión se extravíe, que su
juicio no siga los cauces del deber, por dejarse influir de otra opinión
o por pasión, prejuicio o temor; y el juez que ahora resuelve ha
adquirido la seguridad de que su juicio no está herido por ninguna
pasión, temor, afecto, ni recelo. Quiere llegar al fondo, al alma del
caso que tiene ante sí, porque cree que los jueces no son mecánicos
aplicadores del precepto. Pero quiere, debe y puede quedar tran-
quilo de que su resolución es justa y absolutamente imparcial.

"De un lado, un peticionario que alega ser el padre de una niña
que se halla privada de su libertad, e ilegalmente detenida en poder
de otra persona. Este hombre dice que esa niña nació un mes después
de contraído el matrimonio; que entonces no quisieron él ni su esposa
arrostrar la censura social, y entregaron la recién nacida a una vieja
sirvienta, y que luego, aún arrostrando la misma censura, quieren
tener con ellos a la niña, y tienen que acudir a los tribunales. Si
damos todo esto por cierto y positivo, forzoso será reconocer que el

desprenderse de un hijo por evitar la censura de la sociedad, es algo terrible y que no habla en favor del progenitor, ya que antepone al amor del hijo, el propio amor y el deseo de no ser objeto de censura. Hay una subversión de sentimientos en ese acto; hay quizás una mal entendida valoración de la importancia de la censura de la sociedad, y hay la realización de un acto malo esencialmente, para borrar o atenuar los efectos de un error hijo de la pasión. Pero no hay culpa sin redención, y el arrepentimiento, lo mismo en el orden de una sana moral humana, que en el orden religioso, lava la culpa o la redime. Si la prueba favorece al peticionario, y si la ley está con él, su culpa pasada no es óbice para que se le entregue su hija.

"De otro lado, un hombre que en unión de su noble compañera, ha realizado un acto de caridad inmenso, que ha recogido una niña, enferma, desamparada, desvalida; que la ha sustentado, que la ha cuidado, que ha velado su sueño con el amor y desinterés de un padre; que ha cimentado, él como su esposa, un amor inmenso para esa criatura, que providencialmente vino a su poder; y a quién casi repentinamente se le pide que entregue a la que ya es una parte de su sér y de su vida. Y este hombre nos dice que no sabe que aquél que le reclama la niña sea su padre, y se resiste a entregarla mientras no tenga la convicción de que el que la pide es quien, con arreglo a la ley humana, tiene un mejor derecho a la custodia de la menor.

"La cuestión queda, en realidad, reducida a dos extremos:

"1°. ¿Ha probado el peticionario ser el padre de la niña que se halla en poder de Felipe Sánchez Osorio, y que esa niña sea la por él inscrita en el Registro Civil de Río Grande, bajo el nombre de Nancy Aida Chabert y Ojeda?

"2°. ¿Se ha probado que Felipe Sánchez Osorio detenga ilegalmente en su poder a una hija del peticionario o a cualquier otro menor?

"En cuanto al primer extremo, es forzoso para el peticionario presentar prueba suficiente y convincente de que la niña que se trajo a esta corte por Sánchez Osorio es su hija. Si el hecho se hubiera aceptado y admitido, la aplicación del derecho sería tan elemental que cualquier profano la haría sin vacilación. En ese caso, la ley impera sobre y contra todo sentimiento—tal es la teoría consagrada— y no habría sino entregar la menor al padre legal, quien con arreglo al código, debe tenerla en su custodia. Pero como se ha negado ese hecho básico y fundamental, la corte tiene que proceder con toda precaución al examinar la prueba, y debe exigir prueba satisfactoria

de la identidad de la niña, y del carácter de padre de la misma, que el peticionario alega tener.

   *       *       *       *       *       *       *

"En cuanto toca a la identidad de la niña, es esta la materia más difícil en el caso, y es quizás la que requiere mayor y mejor prueba. Si Aida, o Aida Milagros, como la llama Rosalía González, es la misma Nancy Aida Chabert inscrita en el registro en mil novecientos diez y nueve por Augusto de Chabert, es el extremo que ha debido probarse más convincentemente; y la corte encuentra que es uno de los que no se han probado. Necesitamos una prueba de convencimiento, positiva, que pueda dejar en el ánimo del juez la seguridad de que si entrega al peticionario esa niña, le está entregando algo suyo, a que tiene derecho. A falta de otro testimonio, que quizás pudo presentarse por el mismo peticionario, el mejor que acerca de este extremo ha aparecido en el juicio, es el de Rosalía González; y ese es en absoluto adverso al peticionario. Reconoce el juez que esta testigo, aún en los momentos más duros del contra interrogatorio, se sostuvo, bajo una lluvia de habilísimas preguntas, de una manera y con una seguridad asombrosa. Es cierto que ella, aunque vaciló, y aún negó en ese extremo, fué a ver al abogado señor Gaetán Barbosa. No sabemos lo que pudo manifestarle; pero de todas formas, ella ha afirmado bajo su juramento, que no conoció a la persona que aquella noche vino a buscarla, que no conocía al peticionario Chabert como padre de la niña, y que no tuvo con él relación en ese carácter; y que se le dijo por un agente de negocios que ella debía reclamar sus gastos y que el agente dijo que sabía quién era el padre de la niña; pero no encontramos la afirmación de que ella supiera y le contestara que lo era una determinada persona.

"En el argumento del caso se ha dicho que esta testigo mintió al declarar. No puede sostener el juez esa misma creencia, conforme a lo que ha visto y oído en las sesiones celebradas en este caso. Si el juez pudiera hacer tal afirmación, su decisión y su declaración serían tan terminantes como severas. Pero no habiendo una base para afirmar tal concepto, no puede, ni debe la corte pasar por cima de la declaración de Rosalía González y anularla arbitraria y caprichosamente.

"Si el que resuelve ahora este caso, tuviera la convicción suficientemente satisfactoria de que el peticionario es el padre de la niña que se halla en poder de Felipe Sánchez Osorio, y de que la niña es la misma Nancy Aida Chabert y Ojeda, no habría humano poder que le impidiera entregar esa niña al peticionario. Pero mientras tal

convicción no exista, no debe resolver en ese sentido.  Quizás el peticionario pueda presentar en otra ocasión prueba suficiente, y obtener lo que se propone; pero con la prueba ahora presentada, no encuentra la corte que se justifique una decisión como la que reclama.

"Si Felipe Sánchez Osorio tiene en su poder una niña que le fué entregada por Rosalía González, la que a su vez recibió la criatura de manos de otra persona que no nombra; y si no se ha hecho a Sánchez Osorio reclamación por persona que le pruebe ser el **padre** de la menor y tener por ley mejor derecho que él a su custodia y compañía, no hay duda que la menor no está ilegalmente detenida por Sánchez Osorio, sino que hasta ahora, se halla legalmente en su poder y custodia.  Y si esto es así, hasta que con arreglo a la ley y a la prueba se justifique la existencia y la reclamación de persona que tenga ese mejor derecho, la corte no puede conceder lo que ahora se pretende por el peticionario.

"No sabe el juez si esta decisión estará revestida del acierto que con absoluto fervor ha invocado y pedido.—Sabe que ha puesto toda su fe y todas las fuerzas de su espíritu, en la investigación de la verdad en el caso, y que su decisión es hija de una conciencia honradamente exenta de pasión y prejuicio, y de acuerdo con el convencimiento que han creado las pruebas en el caso.  Cuando los hechos primeros, originales, se han rodeado de misterio y oscuridad, es preciso que el que juzga exija que toda oscuridad desaparezca, que todo misterio se solare, con absoluta claridad, para resolver una petición como ésta."

Del anterior resumen de la corte varias cosas resultan inmediatamente por sí evidentes.  El juez sentenciador conocía perfectamente que la opinión pública estaba excitada y sabía con pesar que su decisión iba a ser el blanco de más o menos crítica adversa.  Comprendía también que una vez establecida la identidad de la niña el derecho del padre sería absoluto; que el brazo de la justicia quedaría obligado irremediablemente por la letra de la ley y la conciencia de la corte estaría paralizada y sin poder actuar ante la faz austera de los precedentes de los casos resueltos (*stare decisis*).  Verdaderamente es difícil eludir la conclusión de que el juez recurrió a la alegada omisión en establecerse la paternidad como único medio disponible para poder llegar a una con-

clusión justa y equitativa. Que ante estas dificultades imaginarias se negó el remedio solicitado, al parecer fundado en el principio de "*fiat justicia, ruat coelum*" es una prueba elocuente del sentido de justicia y pureza de propósito que sobrevino a tal situación.

El concepto erróneo de la corte inferior en cuanto a la naturaleza absoluta del derecho alegado por el padre y de la carencia total de facultad o discreción judicial para investigar o resolver cualquier cuestión que no fuera la de la paternidad, si no restringió el alcance de la investigación indudablemente hizo imposible la debida consideración de los hechos más importantes revelados por el peticionario, así como por los testigos del demandado que ni siquiera fueron mencionados por el juez sentenciador al hacer el resumen de la prueba.

"La determinación y reconocimiento de la custodia de menores mediante el auto de *habeas corpus* tiene el carácter de un remedio en equidad, y en tales casos no está envuelta la cuestión de la libertad personal, pues un menor por razones claras y humanas se presume que se encuentra bajo la custodia de álguien hasta tanto ha llegado a su mayor edad; y cuando a la corte se pide que entregue a un menor no está obligado por ningún mero derecho legal del padre o tutor, sino que ha de considerarlo debidamente como una reclamación fundada en la naturaleza humana y generalmente equitativa y justa. Por consiguiente, estos casos no se resuelven por virtud del derecho legal del peticionario a ser liberado de una detención o prisión ilegal como en el caso de un adulto, sino por el criterio de la corte en cuanto a los mejores intereses de aquéllos cuyo bienestar exige que estén bajo la custodia de una u otra persona; de aquí que una corte no está obligada en ningún caso a poner a un niño bajo la custodia de ningún peticionario o persona sino que debe, en el ejercicio de una sana discreción judicial, después de la debida consideración de los hechos, dejarlo bajo aquella custodia que por el momento demande el bienestar del niño. De conformidad con esto, aunque el padre generalmente tiene derecho a la custodia de sus menores hijos y en procedimientos de *habeas corpus* las cortes tienen la facultad de confiarle tal custodia, la solicitud, sinembargo, es dirigida a la discreción de la corte y dicha custodia puede serle restringida al padre cuando

aparece claramente que debido a su ineptitud para la misma, o por otros motivos suficientes los intereses permanentes del niño se sacrificarían con el cambio de la custodia.'' 12 R. C. L. 1215, párrafo 34.

Una opinión instructiva del Juez Betts emitida en el caso *In re Berry*, Corte de Circuito de los Estados Unidos para el Distrito Sur de New York, que aparece adicionada al caso *In re Burrus*, 136 U. S. 586, y publicada a solicitud de la corte, se cita también con aprobación en el caso *New York Foundling Hospital* v. *Gatti*, 203 U. S. 429, cuyo párrafo final en la página 439 es como sigue:

"La facultad para conocer de la detención de menores por personas particulares que no tienen a dichos menores bajo algún derecho o por virtud o autoridad de ley, descansa únicamente en Inglaterra en la Ley Común. Es una de las altas prerrogativas de la Corona que confiere al Monarca la custodia de los niños que es tan importante como la de sus padres naturales. La prerrogativa real ejercitada primero personalmente *ad libitum* por el Rey (12 Pet. 650,) y luego en su lugar por funcionarios especiales como el Lord High Constable, el Lord High Admiral y el Lord Chancellor, con el transcurso del tiempo pasó a las altas cortes de equidad y ley y en ellas esta elevada prerrogativa de permitir y poner en vigor el auto de *habeas corpus ad subjiciendum*, vino a formar parte como rama elemental de esta jurisdicción. En el ejercicio, sin embargo, de esta alta función respecto a la detención de menores por los padres, etc., la corte o juez aún actúa con sumisión al principio original del cual surgió que los niños deben dejarse donde se encuentran, o sacarse de esa custodia y trasladarlos a la de otra persona a discreción del tutor privilegiado, y de acuerdo con su opinión respecto a sus mejores intereses y seguridad.''.

Véase también a Church sobre *Habeas Corpus*, páginas 696, 697, 698 y 700, párrafos 440, 441 y 442.

El caso de *Le Hardy* v. *Acosta*, 18 D. P. R. 450, no fué un procedimiento de *habeas corpus* sino una acción "seguida por Le Hardy contra la madre de su difunta esposa, para que quedaran sus hijos Philipps y Hilda, de cuatro y tres años respectivamente y los que había dejado temporalmente al cuidado y custodia de la demandada sometidos a su auto-

ridad como padre de los mismos, haciendo uso de su autoridad paterna *patria potestas* que le concede nuestro Código Civil.''

La única sugestión de una conducta áspera por parte del peticionario en ese caso hacia sus hijos aparecía de la alegación hecha por la abuela, de que equivalía a ''excesivo trato cruel hacia estos niños por parte del demandante el hecho de sacar a dichos niños del cuidado maternal de la demandada para llevarlos a vivir a su nuevo hogar en las condiciones que han sido expresadas y a una edad tan tierna.''

El lenguaje empleado como se indica en la opinión misma, debe leerse ''a la luz de las alegaciones hechas en los alegatos, de la prueba aducida en el juicio y de la ley aplicable a los hechos.'' En él no se resuelve que en una solicitud de *habeas corpus* la misma regla sería de aplicación. No había necesidad de resolver que aún en una acción de la naturaleza como la que entonces se consideraba, una corte sentenciadora no tendría ninguna facultad para considerar, en circunstancias concebibles, cuestiones de ninguna clase que afecten directamente a la salud, felicidad o bienestar de los niños con excepción del trato severo o influencia, consejos o ejemplos corruptores. Cualesquiera declaraciones incidentales (*dicta*) que pueda haber en la opinión y que sean susceptibles de tal interpretación no sólo no están en manera alguna sostenidas por nada que indique un razonamiento deliberado, sino que ha quedado demostrado por los hechos referidos, así como por otras declaraciones hechas en el contexto, que no han merecido la consideración que exige la importancia de las cuestiones envueltas. La opinión hasta ese punto, asume sin muy clara razón, que dictar sentencia contra un demandante en un pleito ordinario seguido por el padre para obtener la posesión o recobrar la custodia de su hijo, es privar a dicho padre de la *patria potestad,* o suspenderle en el ejercicio de ésta. Puede admitirse que exista algún derecho correlativo, pero de ahí no ha de seguirse que

la diferencia entre un procedimiento para privar a un padre de su *patria potestad* o suspenderle en el ejercicio de la misma y el recurrir el padre a procedimientos de *habeas corpus* para recuperar la verdadera posesión física de un niño que se encuentra fuera de su custodia y control, es una mera distinción y no una diferencia.

La cita al caso de Ryan si no es con la aprobación de la consideración con que ha visto la corte de Louisiana la felicidad y el bienestar futuro del niño, por lo menos sin un comentario en contra sobre tal actitud o esfuerzo por marcar cualquier distinción respecto a los hechos, es significativa.   Se admite expresamente que la *patria potestad* no lleva consigo "el derecho inmediato a la custodia física de los niños por parte del padre sin reservas o condiciones." También se ha dicho claramente—

"Que el bienestar de los niños debe ser protegido cuidadosamente por las cortes; pero deben ellas recordar que la ley ha sido decretada teniendo también en cuenta esta cuestión." 21 Cyc. 331, 332 y 333; *in re* Gates, 95 Cal. 461.

La cita hecha primeramente en apoyo de esta proposición es la siguiente:

"En igualdad de circunstancias al resolverse la cuestión de la custodia los padres del niño serán preferidos en oposición a terceras personas incluyendo los abuelos y otros parientes.   En una contienda entre padres, teniendo el padre el derecho de acuerdo con la ley a los hijos, a veces se le prefiere, pero otras se prefiere a la madre, especialmente si el hijo es muy pequeño y requiere el cuidado de la madre, o es ilegítimo.   Los parientes del niño generalmente serán preferidos a un particular, pero no siempre y por lo general la custodia legal es la debida custodia a falta de circunstancias excepcionales."

La opinión del Juez Presidente Beatty en el caso de California citado últimamente, es breve y puede transcribirse en su totalidad, a saber:

"La peticionaria Margarita J. Olsen, residente del Condado de Santa Clara, es la madre de Della Gracie Gates de diez años y cinco

meses de edad, quien según alega la peticionaria se encuentra restringida indebidamente de su libertad por James Eldridge, en su residencia en el Condado de Lassen. El referido Eldridge admite que tiene la custodia de la niña y alega un derecho a ella por virtud de una orden de la Corte Superior del Condado de Shesta, que lo nombró su tutor.

"De los hechos revelados en la petición, diligenciamiento y prueba aducida en la vista estoy convencido de que la orden nombrando al Sr. Eldridge tutor de la niña es nula por falta de jurisdicción y que la peticionaria es la persona que legalmente tiene derecho a su custodia. Pero en vista de las circunstancias especiales del caso, no me siento obligado a dictar ninguna orden coercitiva por la que el mero derecho legal de la peticionaria pueda reconocérsele contra la inclinación manifiesta de la niña y razonable elección para que quede donde se encuentra, la peticionaria renunció voluntariamente al cuidado de su niña cuando ésta apenas tenía un año, y desde que tenía dos años de edad la ha dejado bajo el exclusivo cuidado y gobierno del Sr. y Sra. Eldrigde, siendo esta última hermana del padre de la niña. La consecuencia natural e inevitable ha sido que esta niñita, que no conoce a otros padres o protectores, que nunca ha visto a su madre sino dos veces por unos nueve años se ha apegado tanto a su tío y tía como también éstos a ella, que ha considerado a su madre como una persona extraña. Aunque ella no ha llegado a una edad de discreción legal, es lo suficientemente inteligente para que en cierto modo pueda dejársele hacer su elección en la cuestión que afecta tan profundamente a sus sentimientos e intereses; y habiéndola examinado privadamente estoy convencido que no sería sino un acto de extremada crueldad desprenderla del único hogar que siempre ha conocido aún cuando sea con el propósito de dejarla bajo el cuidado de su propia madre. Sus intereses materiales también se mejorarán dejándola donde está y donde quiere ella permanecer. Su madre carece de recursos para sostenerla con excepción de aquellos que pueda suministrarle su actual esposo quien por dispuesto que pueda estar no tiene obligación legal alguna de sostener a una hijastra y son pocos los medios que tiene de hacerlo. El Sr. y la Sra. Eldridge por el contrario tienen bastante recursos y no tienen hijos. Viven en un sitio saludable en el campo, donde todo el medio ambiente es favorable al bienestar moral y material de la niña y tienen los medios y condiciones de poder atender a su sostenimiento, educación y futuro bienestar y seguridad.

"Bajo estas circunstancias considero que mi deber en este caso

queda cumplido viendo que la niña quede libre de toda restricción ilegal y dejándola en libertad para que pueda ir al hogar de su elección.

"Se anula el auto."

Siendo tal la doctrina sentada por las autoridades citadas para sostener la conclusión a que se llegó en el caso de *Le Hardy* v. *Acosta,* y estando fundadas las subsiguientes decisiones de este tribunal en el caso de Le Hardy, sin nada nuevo por vía de argumentación, difícilmente puede considerarse la cuestión como resuelta por las autoridades *(stare decisis).* Por el contrario, parecería razonablemente prudente suponer que si los hechos en el caso de Le Hardy hubieran demostrado que el bienestar de los niños exigía claramente una resolución en sentido contrario, podría haberse llegado a una conclusión diferente sin gran dificultad en cuanto al efecto que ha de darse en tales circunstancias a los preceptos del artículo 236 del Código Civil. Pero de todos modos la cuestión envuelta en este caso jamás ha sido resuelta en esta corte por el tribunal en pleno en un procedimiento de *habeas corpus.*

La opinión disidente del Juez Presidente Sr. Hernández con la que estuvo de acuerdo el infrascrito, en el caso de *Arbona* v. *Torres,* 24 D. P. R. 450, que fué asimismo un procedimiento ordinario, no un procedimiento de *habeas corpus,* establece claramente la distinción entre el derecho a la *patria potestad* y la forma y condiciones de su ejercicio. Allí se dijo que la *patria potestad* de acuerdo con nuestra vigente ley no es para beneficio del padre o la madre sino para el del hijo que la necesita. Ha quedado demostrado concluyentemente que tal derecho no es absoluto sino que lleva consigo ciertos deberes y obligaciones solemnes, cuya completa negligencia o abandono puede justificar a una corte para negarse a devolver a un padre natural la custodia de un niño. Hablando de los hechos en ese caso se dijo:

"Que a la corte incumbe en uso de sus facultades discrecionales,

precisar y determinar si en un caso como el presente debe darse al
padre la custodia de la niña de modo que pueda cumplir con los de-
beres paternales que le impone la *patria potestad* o si con tal fin debe
dejarse en poder de la madre.''

Otro párrafo de la opinión es el siguiente:

''Para el caso de relaciones ilícitas terminadas de hombre y mujer
con hijos naturales procreados durante esas relaciones, expresamente
nada provee la Legislatura y nos parece contraria a la razón natural
y a la equidad la teoría de negar a la madre natural toda clase de
derechos mientras viva el padre que ha reconocido la prole en aquélla
habida, y otorgar al padre natural que sin razón alguna abandona a
la mujer en quien ha procreado hijos, privilegios que no tiene el
hombre que engendra hijos dentro del matrimonio y abandona a su
legítima esposa.    Semejante teoría conduciría al absurdo de reconocer
a un padre más desnaturalizado que natural, el derecho de arrancar
a un hijo reconocido de los brazos de su madre, en los primeros días
de su existencia en que necesita ser lactado.''

Y la conclusión final a que llegó la corte es la que a con-
tinuación transcribimos:

''No es posible sentar como principio absoluto e inflexible que el
hijo natural haya de vivir con el padre que lo ha reconocido y ejerce
sobre él el derecho de la *patria potestad.* Las condiciones del ejer-
cicio de ese derecho debe regularse por las cortes, según las circuns-
tancias especiales de cada caso, sin olvidar nunca que la *patria po-
testad* según nuestro derecho actual no es un beneficio para el padre
o para la madre sino para el niño que de ella necesita.

''La niña Rosa al ser reclamada su entrega por el demandante,
contaba solamente dos años y medio de edad y necesita aún, como es
natural en tan tierna edad, los cuidados amorosos y solícitos desvelos
de la madre que le dió el ser.    Esa niña ha vivido siempre con su
madre, a quien naturalmente ha de profesar más cariño que al padre.
La moralidad actual de la madre es reconocida por el padre.    El
matrimonio legítimo del padre en el que ya ha procreado una niña
ha de traer dificultades de orden moral para el sostenimiento de las
relaciones de la madre con la hija.    Habida consideración a esas cir-
cunstancias especiales, se está en el caso de negar al demandante el
derecho de separar la niña de la madre, bajo cuya compañía y amparo
debe continuar, sin perjuicio de modificar esa resolución cuando mo-

tivos razonables así lo aconsejen. Con ello no se priva al padre bajo ningún concepto de condición alguna esencial al derecho de *patria potestad.*"

Ni el artículo 236 ni ningún otro dispone que nada que no sea "excesiva crueldad" u otra mala conducta especificada constituirá obstáculo (*estoppel*) para el padre que invoca la ayuda de una corte de justicia en un procedimiento en equidad. Pero el mismo código que para beneficio de los hijos confiere a los padres el derecho a la *patria potestad* y prescribe las circunstancias bajo las cuales dichos padres pueden ser privados de la misma por las cortes, a la vez dispone en su título preliminar que trata de las leyes sus efectos y de las reglas generales para su aplicación, que "cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos."

La *patria potestad* de la ley civil no es tan absoluta como era el derecho del jefe de familia en la Ley Común. Sin embargo, las cortes inglesas y americanas a través de años de persistentes esfuerzos han logrado éxito en considerar de mucha más importancia que cualquier derecho correlativo a la custodia de los hijos, el superior interés público del bienestar de los hijos. Y no hay razón muy clara por la cual los beneficios del lento, pero eficaz progreso alcanzado en este sentido no deban ser percibidos en esta Isla hoy día lo mismo que de aquí a un siglo.

Las cortes de Louisiana no han encontrado en la ley civil obstáculo alguno insuperable para la adopción de la regla que prevalece en otras cortes americanas.

La Corte Suprema de ese Estado ha dicho que—

"La regla de la Ley Civil en ese respecto no se diferencia de la de los Estados donde rige la Ley Común." *State* v. *Traham,* 125 La. 311.

En el caso *State ex rel. Lasserre* v. *Mitchell,* 105 La. 741,

se sugiere que el derecho de la comunidad a velar por la educación de sus miembros, y rechazar aquéllo que para su propia conservación y bienestar cree que debe rechazarse, es superior al derecho y a la autoridad del padre.

De la misma opinión hacemos la siguiente cita:

"La corte está investida de facultad con una sana discreción para conceder o denegar el remedio. El niño mismo en contiendas de esta naturaleza tiene derecho a que se le proteja en cierto modo por parte de la corte. Los padres en contiendas como ésta no solamente alegan sus propios derechos de acuerdo con la ley sino que actúan para y a nombre del niño; y en cuanto a esta cuestión el Estado mismo como se dijo en el caso de Bermúdez tiene un interés que va más allá del mero derecho y autoridad y del padre o de la madre. El derecho de ninguno de éstos es absoluto. El derecho de cualquiera de ellos o de ambos depende de cuestiones de hecho (*in pais*) de las cuales es el objeto del auto hacer una amplia investigación, por medio de un examen acabado bajo juramento, de modo que el tribunal pueda tener ante sí todos los informes que puedan obtenerse. Apenas si creemos que un auto de *habeas corpus* dirigido a una mujer y relativo a la custodia de un niño menor de edad pueda considerársele como una acción seguida por el esposo contra la esposa porque la parte que solicita la acción del gobierno es el marido y aquélla contra quien el auto se dirige es la esposa, y el hijo de ellos. Es el resultado de la manifestación hecha de que el hijo está indebidamente restringido de su libertad y que deben investigarse los hechos del caso."

En el caso *State ex rel. Taylor* v. *Jones,* 113 La. 298, el tribunal se expresa en la siguiente forma:

"El niño de acuerdo con las leyes naturales tiene ciertos derechos que no siempre han de pasar desapercibidos. La voluntad del padre no es siempre suprema. Puede surgir un caso que por las circunstancias excepcionales no esté comprendido dentro del alcance del artículo del código invocado por el peticionario."

En el caso *State* v. *Trahan, supra,* después de indicarse como ya hemos dicho que el principio que fundamenta las disposiciones del Código Civil no es incompatible con la práctica de los Estados de la Ley Común, la opinión procede a decir lo siguiente:

"Al considerar la cuestión del bienestar y felicidad de la niña la conducta de uno o de ambos de los padres hacia ella es un factor adecuado y legítimo que ha de tenerse en cuenta. Si hay razón para creer que los esfuerzos del padre por obtener la custodia y cuidado de la niña no se deben a la consideración que tiene por su bienestar y felicidad sino que se refieren a algún otro motivo que no sea éste, el juez no debe vacilar sino que debe dejar a la niña donde se encuentra feliz y satisfecha y bien atendida en todo sentido.

"La línea de conducta del apelante no ha sido tal que nos haga creer que él actúa en esta cuestión por afecto hacia la niña o en consideración por su bienestar y felicidad. El nada tiene que decir en contra de que la niña quede donde está. No se queja del medio ambiente en que se encuentra. No tenemos razón alguna para creer que no es como debe ser. La prueba en los autos niega la alegación de la petición de que la esposa se llevó a la niña y que ha ocultado su paradero del padre.

"Creemos, de acuerdo con la prueba, que el padre sabía o pudo fácilmente saber precisamente dónde podía encontrar a su hija durante todos esos años y que por una u otra razón no quiso tomar ninguna acción en el asunto. Creemos que la misma madre tiene derecho a ser considerada en vista de las circunstancias de este caso. Ella ha cumplido fielmente sola y sin ayuda de su esposo con todos sus deberes tanto en las enfermedades como estando en salud la niña por los últimos diez años. El requerimiento por obtener la hija hecho por el demandante se basa solamente en sus simples y absolutos derechos legales como padre y se presenta a nosotros bajo circunstancias muy poco favorables. Esa solicitud ha sido opuesta por la madre por vía de defensa lo que según nuestra opinión tenía ella derecho a alegar al ser planteado el punto en controversia.

"Creemos que el juez sentenciador procedió correctamente al negarse a separar a la hija de la madre bajo las circunstancias reseñadas."

Y en el caso *Ex parte Ryan,* 126 La. 455, el cual se distingue en cuanto a los hechos en el de Le Hardy sin desaprobarse la doctrina enunciada, se dice lo siguiente:

"Estos procedimientos por *habeas corpus* apenas si pueden ser considerados como una acción entre el peticionario y el demandado.

"Es una cuestión (como se dijo en el caso de *Lasserre* v. *Michel,* 105 La. 741, 30 South. 122, 54 L. R. A. 927) en la cual el estado

tiene un interés que va más lejos del de el mero derecho y autoridad del padre. El bienestar y felicidad del niño han de ser considerados por la corte.''

En vista de la forma en que ha de resolverse este caso, preferimos no discutir la prueba en detalle.

Que el peticionario es el padre de la niña que ahora se encuentra bajo la custodia del demandado, es cuestión que no está sujeta a duda razonable alguna. Sobre este punto no hay duda en la mente de ninguno de los miembros de esta corte.

Pero se ha sugerido que la cuestión relativa a los mejores intereses de la niña debe alegarse en la corte inferior, y en los casos resueltos, así como en las obras de texto indudablemente que se ha hablado mucho de las cuestiones de alegaciones incluyendo la de qué es lo que constituye una contestación suficiente.

Sin embargo, muchos si no la mayoría de los casos que envuelven la custodia de niños, parecen tratar primero, sino exclusivamente, del principio en que descansa la evolución de este uso del auto, según parece sin tener en cuenta las cuestiones técnicas de alegaciones y práctica; y si el bienestar del niño es la consideración superior entonces el elemento de alegación puede considerarse como cosa relativamente de menos importancia.

Así, pues, en Church sobre *Habeas Corpus*, sección 442, página 702, leemos lo siguiente:

''Cuando un niño o menor está fuera de la posesión y custodia del padre, dice el Juez Sr. Stone, de la Corte Suprema de Alabama en un reciente caso, 'y se recurre al auto de *habeas corpus* por este último para obtener tal custodia, no surge como cuestión de derecho necesaria que la petición del peticionario sea concedida. La corte está investida de una sana discreción para conceder o denegar el remedio, la cual ha de ejercitarse siempre para beneficio del menor primeramente pero no arbitrariamente en desatención del derecho natural del padre a que se le dé preferencia. Si el padre razonablemente está en condiciones y puede atender y socorrer a su hijo gene-

ralmente debe concederse su petición.  Si por otra parte él no está
en condiciones o no puede debidamente atender a su prole, y parti-
cularmente si esa prole pensando bien prefiere no volver donde él,
la corte no debe concéder ningún remedio dentro de las circunstan-
cias, sino dejar a las partes *in statu quo.*'   A menos que resulte que
los mejores intereses del hijo lo requieren de un modo imperioso, la
corte, dice el Juez Holt, en el caso de *Green* v. *Campbell,* 35 W. Va.
698, 704, 'al considerar relaciones tan delicadas y que tan fácilmente
están en pugna irreparablemente, seguirá el camino discreto de dejar
las cosas como se encuentran.' "

Casi la misma tendencia de criterio parece manifestarse
en el sumario del caso de Gatti y en un número de resolu-
ciones de Louisiana, *supra.*

A la luz de tal texto bien podemos considerar si la mera
omisión del demandado en hacer una amplia contestación
cualquiera que pueda ser el efecto, considerada como una
renuncia de su propio derecho, puede o no perjudicar al
derecho del menor a la protección de la corte, coartar la
conciencia del juez sentenciador, o restringir su discreción;
si el peticionario que en un procedimiento de equidad invoca
el auxilio de una corte de justicia mediante el ejercicio de
su actuación como *parens patriae,* no levanta así necesaria-
mente la cuestión vital; o tal vez sería más correcto decir,
si la ley misma, dado el interés público que siempre está
envuelto no promueve la cuestión en favor del niño desam-
parado y constituye suficiente aviso para el peticionario de
cualesquiera hechos que puedan revelarse en el juicio y que
no constituyan una verdadera sorpresa.

Cualquiera que sea nuestra conclusión final sobre esta
cuestión la que ingénuamente confesamos no ha sido materia
de detenida investigación en este caso, no es cosa que pueda
resolverse ligeramente y bien podemos apresurarnos, aun-
que cautelosamente a determinar hasta donde puede permi-
tirse que las reglas de alegaciones en acciones ordinarias
rijan en procedimientos de *habeas corpus* ante las cortes

insulares.   Pero no es necesario ahora escudriñar más en
este sentido.

Puede admitirse que en el presente caso la cuestión de
los mejores intereses de la niña no fué tan claramente pro-
movida por las alegaciones ni tan ampliamente desarrollada
en el juicio como pudiera esperarse.   Pero difícilmente puede
decirse que la cuestión no estuvo ante la corte sentenciadora
por virtud de las alegaciones y de la prueba cuando el caso
fué sometido.

El abogado del demandante debió haberla tenido en cuenta
al redactar la solicitud y el abogado del demandado, serena,
pero deliberadamente procedió en igual forma al examinar
sus testigos en tanto no se hizo objeción, aunque pronta-
mente desistió al sostener la corte una objeción hecha por
primera vez después de haberse presentado los hechos más
importantes.   Esta actitud del abogado del demandado sólo
se explica por la teoría de que él participaba en gran modo
de la firme convicción del juez sentenciador respecto al efecto
legal de las anteriores decisiones de esta corte.   La moción
del peticionario al empezar el juicio para eliminar hasta la
lacónica contestación con sus simples negativas y exposición
concisa de nueva materia, por el fundamento de que el de-
mandado estaba circunscrito a probar alguna "autoridad"
para la alegada restricción ilegal, como sucede cuando un
preso está detenido por virtud de un mandamiento u otra
orden, si fué declarada sin lugar, no tenía por objeto ni ten-
día a ampliar el alcance de la investigación sobre los méritos.

Alega la solicitud entre otras cosas:

"5. Que tanto don Felipe Sánchez Osorio como su señora no son
parientes en ningún grado, ni por consanguinidad o afinidad de la
niña Nancy Aida Chabert y Ojeda ni de sus padres don Augusto de
Chabert y doña Margarita de Ojeda, ni son tutores o guardianes.

"6. Que el peticionario tiene su hogar constituído y cuenta con
medios suficientes para mantener, criar, y educar a su hija, la niña
objeto de esta petición y que tanto él como su señora esposa están

dispuestos y se comprometen a criar, educar y atender todas las necesidades de su hija.''

La contestación niega la alegación citada en último término y alega como materia nueva:

''Que allá por el mes de octubre del año 1913, una anciana nombrada Rosalía, le entregó en su residencia en Carolina, una niña, en marcado estado enfermizo y como de un mes de nacida, manifestándole que sus recursos no le permitían subvenir a las necesidades de dicha niña y que ignoraba los nombres de sus padres; que el peticionario movido a compasión por el estado de la niña, la recibió en aquella ocasión y la ha atendido, cuidado y educado cariñosamente, desde entonces a la fecha.''

Ambas alegaciones pudieron haberse ampliado exponiendo hechos adicionales, pero el agregar una mera conclusión o corolario no le hubiera dado esencialmente mayor fortaleza o claridad a ninguna de ellas.

El peticionario en apoyo de su alegada capacidad para proporcionar un hogar a su hija, sostenerla y educarla, declaró que es casado, que vive con su esposa y está empleado en la Porto Rican American Tobacco Company donde gana un sueldo de $25 semanales y tiene dos hijos. En otro respecto dice que padece de filaria y a menudo está enfermo, o al menos estuvo enfermo frecuentemente durante la época inmediatamente siguiente al nacimiento de la hija. Se hace también un esfuerzo por probar que por algún tiempo mientras la criatura estuvo en poder de la vieja partera y antes de venir a manos del demandado, el padre pagó de $3 a $5 semanales para su sostenimiento, aunque esta prueba pierde parte de su fuerza en el examen de repreguntas.

Su declaración directa según el récord taquigráfico concluye como sigue:

''¿Si la corte le entregase a Vd. su hija Nancy Aida Chabert a dónde la llevaría Vd?—A mi casa.

''¿La madre de la niña vive?—Sí, señor.

''¿Con quién vive la madre de la niña?—Conmigo y mi otro niñito.

"¿Vd. atendería a los cuidados de la niña?—Seguramente, porque hoy estoy en condiciones de hacerlo, lo mismo que lo hago con el otro."

Hacemos la siguiente cita de la declaración del demandado como aparece en las notas taquigráficas, a saber:

"Rec: ¿Cuál es su profesión?—Agricultor y comerciante.

\*        \*        \*        \*        \*        \*        \*

"Explique Vd. como vino esta niña a su poder.—Me la entregó la vieja comadrona o partera, ésta porque no podía sostenerla, porque es una vieja de 60 ó 70 años y estaba completamente sola en su casa y no podía atender a la niña y estaba casi moribunda a los 15 ó 20 días de haberla sacado de donde la trajo.

\*        \*        \*        \*        \*        \*        \*

"¿Qué hizo Vd. con ella?—Entregársela a mi esposa, y como me iba al Norte con mis hijos le dije: Hazte cargo de esta niña y defiéndela de la muerte.

\*        \*        \*        \*        \*        \*        \*

"¿Ha hablado Vd. con el Sr. Chabert sobre este particular?— Hace muy poco tiempo que se presentó en mi casa llevando a su esposa y le dije: ¿Qué le ofrece? Vengo a ver esta niña que hay aquí. Aquí está. La niña estaba dormida. Está hermosa, está guapa, está bonita. Es una niñita que críamos en condiciones magníficas porque merece todo nuestro aprecio debido a las condiciones fatales en que llegó a nosotros; la estamos atendiendo con más cuidados que a nuestros hijos. La vieron, la miraron y dijeron: vendremos por aquí. Cuando Vds. quieran, siempre venga a su casa. No nos dijeron nada de sus padres ni absolutamente nada.

\*        \*        \*        \*        \*        \*        \*

"¿Cuánto tiempo hace de eso?—De eso hará ahora 8 meses, 6 meses, una cosa así.

\*        \*        \*        \*        \*        \*        \*

"¿Y después ha habido alguna otra indicación por parte de esos Sres?—Ahora últimamente que fué allá, que le diera la niña, que se la iba a presentar a la abuela. Le dije: 'Yo no lo conozco a Vd. por padre, Vd. no es nada en esta casa ni yo lo puedo aceptar a Vd. como padre de la niña porque ni su misma expresión al verla me demuestra que Vd. es su padre; su Sra. en iguales condiciones, ni se inmuta. Nada, yo la quería ver. Pues no podemos darla así porque esta niña está en tales condiciones.—Ya la ve Vd. que está agarrada a mi es-

posa, que dice mamita, no me deje que me toque esa gente, y nosotros
le decíamos: no la toque.'

    *        *        *        *        *        *        *

"¿Qué atención le ha dispensado Vd. a la niña?—En estos últi-
mos años puedo decir con franqueza que ha mejorado mi posición
económica y hemos atendido a la niña mejor que a nuestros hijos.

"¿La niña sabe leer?—No puede todavía.

    *        *        *        *        *        *        *

"¿Vd. le profesa cariño a la niña?—Más no podré decir, pero
tanto como a los hijos.

"¿Su Sra. de Vd. la ha atendido?—La ha atendido con el cuidado
que acabo de decir, con una singularidad extrema, porque la niña
casi siempre ha estado enfermita, delicada y todo lo que se hace es
solamente para ella, porque mis hijos dos están en el Norte hace 6
años, mi hija, una que cumple ahora 18 años, ha pasado en el Co-
legio de las Madres otros 6 años, y en ese tiempo fué cuando se des-
prendió de sus hijos y cogió esta hija, abarcando casi todo el amor de
todos los demás.

    *        *        *        *        *        *        *

PĒT.: "Esa niñita que está con Uds. ¿cómo se llama?—Aida.

"¿De quién es hija?—No sabemos de quién es hija.

"¿Aida qué?—Aida Sánchez Castaño, le hemos puesto.

"¿Vds. la han inscrito?—No la hemos inscrito porque he estado
averiguando quiénes son sus padres y esperando que mis hijos me
autorizaran a darle el nombre mío, y así ha vivido allí hasta ahora."

Un curioso incidente pone fin al examen directo.

"¿Cuáles son sus medios actuales de fortuna?"

PET.: "Yo me opongo a esa evidencia por inmaterial.

JUEZ: "Yo creo que eso no se ha puesto en *issue* y la corte sostiene
la objeción."

Si por conjeturas o por algún esfuerzo de la imaginación
puede decirse que el fin de la objeción era excluir la prueba
tendente a demostrar que se promovería el bienestar de la
niña dejándola donde ahora está entonces dicha objeción se
hizo demasiado tarde. Las cuestiones arriba reseñadas y
que constituyen la mayor parte de la prueba del demandado,
en su mayoría no se relacionan con la cuestión de la pater-

nidad o identidad de la niña, y la tendencia general y objeto del interrogatorio son perfectamente claros a pesar de la afable conformidad del abogado con el estrecho criterio de la corte respecto a la cuestión envuelta. De no haberse formulado objeción a la pregunta últimamente citada y se hubiera demostrado que el demandado era dueño de una gran participación en la "Guánica Central," ello solamente hubiera variado muy poco el cuadro gráfico ya presentado por este testigo en contraste sorprendente con la serena manifestación con que el demandante termina su misma declaración, *supra,* en el interrogatorio directo.

Hemos hecho referencia a los anteriores particulares de la prueba aportada por las partes mismas sin hacer mención de otras cuestiones más importantes, no con el fin de probar que el bienestar de la niña exige que ella continúe donde está, sino para indicar el alcance que tenía esta cuestión en el caso como ha sido presentado.

La alegación sexta de la demanda y la prueba presentada por el peticionario de acuerdo con ella, no podía tener ningún otro objeto en perspectiva que impresionar a la corte con la idea de que en el presente caso el alegado derecho del padre no está en conflicto con los mejores intereses de la niña.

Los autos en conjunto no dan lugar a duda de ninguna clase respecto a si el abogado del demandado hubiera sospechado por un momento que esta corte o la corte sentenciadora de acuerdo con los precedentes establecidos hubiera permitido una investigación más amplia, entonces una defensa más fuerte y acabada se hubiera alegado en la contestación y desarrollado en el juicio.

Pero sea esto como fuere difícilmente puede decirse que la cuestión de la futura felicidad y bienestar de la niña es tan ajena a las cuestiones litigiosas como fueron presentadas por las alegaciones y la prueba en conjunto en este caso, que no hubieran podido considerarse en absoluto por

la corte sentenciadora, o que no puede considerarse por este tribunal, que en manera alguna está envuelta en esta apelación.

"La regla general es que la corte de apelación solamente tomará en consideración aquellas cuestiones litigiosas que fueron levantadas en las cuales las partes se basaron en la corte inferior. Pero cuando un caso ha sido juzgado sin objeción alguna como cuando las alegaciones promovían ciertas cuestiones litigiosas, la objeción de que la cuestión no fué levantada por las alegaciones, o que las cuestiones no eran completas, no puede hacerse por primera vez en la corte de apelación y especialmente esto es así cuando las alegaciones debido a una razonable y ligera interpretación pueden considerarse como que presentan y levantan la cuestión." 3 C. J. 727-29.

"A la regla general de que las cuestiones que no han sido promovidas en la corte inferior no serán consideradas en apelación se han reconocido ciertas excepciones y limitaciones en las diferentes jurisdicciones."

"Y se ha resuelto que un principio legal aún cuando no haya sido sugerido por una u otra de las partes en el juicio, debe ser adoptado para resolver finalmente el caso en apelación si esto obliga a que se haga cumplir rápidamente un derecho o suministra un remedio para un daño causado y como exposición correcta de la ley es adecuado a los hechos envueltos." *Idem.* 741.

"También se ha resuelto que una sentencia errónea puede ser revocada cuando las partes procedieron por virtud de un error de ambos en cuanto a la ley aunque el único fundamento alegado en la corte *inferior* contra la sentencia no esté sostenido." *Idem. Idem.*

"Otra excepción a la regla general de que las cuestiones que no fueron promovidas en la corte inferior no serán tomadas en consideración en apelación está reconocida en el caso de cuestiones de política pública o intereses públicos." 3 C. J. 742.

El apelante, menos en lo que haya podido ser inducido a error por las anteriores decisiones de esta corte, tendría poca razón para quejarse si la corte inferior hubiera fundado su sentencia en hechos probados de acuerdo con la regla que debió haber regulado al resolverse el caso por sus méritos, o si esta corte confirmara la sentencia apelada por razones distintas a las expresadas por el juez sentenciador.

Y dentro de las circunstancias, no podemos comprender qué razón pueda lógicamente tener el apelante para quejarse si se revocara la sentencia como lo solicita y el caso fuera devuelto a la corte inferior para darle otra oportunidad de ser oído.

En relación con esto debe agregarse que aunque pudiéramos estar justificados por los hechos que aparecen de la faz de los autos en confirmar la sentencia apelada, sin embargo, lo que hemos dicho, *arguendo*, acerca de estos hechos, no tiene por objeto referirse de modo alguno a la situación que pueda luego surgir. El demandante podrá explicar mucho de lo que ahora está sin explicar. La madre que no es parte y que no declaró como testigo puede desear decir algo, o por lo menos su actitud puede darse a conocer. El demandado habrá tenido tiempo para consultar con sus hijos y resolver de modo más preciso la pronta ejecución de sus planes para el futuro de la hija de crianza. La condición económica de las partes puede haber cambiado, o surgir otros elementos más. importantes que dejen la mera cuestión de dinero al sitio que le corresponde. Aunque la mayoría de esta corte cree que el caso como ha sido presentado no justificaría a este tribunal en conceder la custodia de la niña al demandante, la minoría es de opinión contraria, y ninguno de nosotros vacilaría en confirmar tal sentencia a menos que se probara un claro abuso de discreción. Por virtud de una amplia exposición de aquellos hechos adicionales que puedan aducirse, de acuerdo con la regla aquí enunciada, el padre tendrá derecho a tal custodia a menos que aparezca claramente que es conveniente para la futura felicidad y bienestar de la niña que las cosas queden como están.

Considerado todo esto, estamos convencidos de que se promoverán mejor los fines de la justicia sustancial revocando la sentencia apelada y devolviendo el caso para ulteriores procedimiento que no sean incompatibles con esta opi-

nión, mejor que confirmando dicha sentencia, basándonos en los autos tal como se encuentran.

Y así se ordena.

> *Revocada la sentencia apelada y devuelto el caso para ulteriores procedimientos.*

Jueces concurrentes: Sr. Presidente Hernández y Asociado Sr. del Toro.

Disintieron los Jueces Asociados Sres. Wolf y Aldrey.