PHYLLIS ROSELL, por sí y en representación de su hija menor de edad LISA JANE MELÉNDEZ, demandante y recurrida, *v.* FLOR MELÉNDEZ y su esposa ARCELIA CRUZ, demandados y recurrentes.

*Número:* R-70-256 *Resuelto:* 4 de mayo de 1973

*Pedro Malavet Vega,* abogado de los recurrentes; *Cuprill, Cuprill & Cuprill,* abogados de la recurrida.

—O—

Opinión disidente del Juez Asociado Señor Cadilla Ginorio con la cual concurren el Juez Presidente Señor Pérez Pimentel y los Jueces Asociados Señores Martín e Irizarry Yunqué.

San Juan, Puerto Rico, a 25 de octubre de 1973

Disiento de la sentencia dictada por este Tribunal en el presente recurso con fecha 4 de mayo de 1973, por estar profundamente convencido que la sentencia dictada por la Sala de Ponce del Tribunal Superior de Puerto Rico (Hon. Carlos D. Bonaparte, Juez), con fecha 11 de septiembre de 1970, en el caso civil número CS-70-1000, seguido ante dicha Sala por *Phyllis Rosell, por sí y en representación de su hija menor de edad Lisa Jane Meléndez* v. *Julio Meléndez*[1] *y Celia*[2] *y Flor Meléndez*, sobre hábeas corpus, es completamente errónea, contraria a los hechos establecidos; y a una sana y justa doctrina de derecho relacionada con la *custodia y bienestar* de menores de edad, establecida por este Tribunal; y que

---

[1] Julio Meléndez, padre de la menor Lisa Jane, nunca fue emplazado, por lo cual la acción se siguió únicamente contra los codemandados Flor y Celia Meléndez, abuelos de la menor.

[2] Su nombre de soltera es Celia Cruz; y en el recurso de revisión se le llama Arcelia Cruz; aunque en la petición de hábeas corpus se le nombre como Celia Meléndez; pero se trata de una misma y sola persona.

nosotros hemos confirmado y reafirmado en numerosas decisiones; sin que haya razones y fundamentos legales. para que en este caso específico nos apartemos de ella.

Con el más profundo respeto a la opinión de mis compañeros de la mayoría, (3) considero que la sentencia del tribunal de instancia debe ser revocada y dictarse otra declarando sin lugar la petición de hábeas corpus; y dejarse la niña bajo la custodia de sus abuelos, (4) quienes, a la fecha de la sentencia recurrida, la tenían bajo su cuidado, cariño, educación y protección, por alrededor de seis (6) años; y desde que la niña tenía nueve (9) meses de edad; y a la fecha de esta disidencia la han tenido y la tienen bajo las mismas condiciones, alrededor de ocho (8) años consecutivos.

La sentencia de este Tribunal, lacónica como una carta telegráfica nocturna e inescrutable como una esfinge, (5) nos

(3) Al unirse al grupo disidente el Juez Presidente Señor Pérez Pimentel, por su voto explicativo del 18 de mayo de 1973 (ver escolio 5, último párrafo, página 332), la sentencia recurrida no se sostuvo por mayoría, sino por un empate cuatro (4) a cuatro (4) y uno abstenido.

(4) La abuela paterna de la niña es la codemandada doña Celia y/o Arcelia Cruz de Meléndez, madre de Julio Meléndez, padre de la niña. El codemandado Don Flor Meléndez es el esposo de doña Celia; siendo el segundo matrimonio de esta última. Julio es hijo del primer matrimonio de doña Celia siendo don Flor su padre político y, por tanto, abuelo político de la menor.

(5) Dicha sentencia está comprendida en un párrafo que copiado literalmente, lee así:

"Examinados los autos de este caso, la transcripción de evidencia, las determinaciones de la Sala sentenciadora, y consideradas las cuestiones suscitadas en este recurso, habiendo oído los argumentos orales de las partes en sesión reciente, y no existiendo aquellas circunstancias verdaderamente excepcionales que justifiquen nuestra intervención con las determinaciones de la Sala sentenciadora concediéndole la custodia de la menor Lisa Jane Meléndez a su señora madre, aquí recurrida, se confirma la sentencia dictada por el Tribunal Superior, Sala de Ponce, objeto de este recurso.

". . . El Juez Presidente, Señor Pérez Pimentel y el Juez Asociado Señor Díaz Cruz no intervinieron. Los Jueces Asociados Senores Martín, Cadilla Ginorio e Irizarry Yunqué disintieron, reservándose el derecho a explicar su disenso en opinión separada."

Dos mociones de reconsideración de la anterior sentencia, radicadas por los recurrentes fueron declaradas sin lugar por resoluciones del 18 y 31

lleva a tener que descorrer el velo de Isis para conocer los hechos y los personajes que intervienen en el doloroso drama humano desarrollado en este caso en el cual la víctima inocente es la niña Lisa Jane Meléndez.

La prueba admitida por el tribunal de instancia demuestra que de relaciones extramaritales habidas entre la peticionaria Phyllis Rosell y Julio Meléndez nació la niña Lisa Jane Meléndez el día 27 de junio de 1964, en la ciudad de Chicago, Estado de Illinois, Estados Unidos de América. A dicha fecha del nacimiento de la niña, su señora madre Phyllis Rosell estaba casada con otro hombre, de quien había tenido una niña llamada "Terry Ann", la cual, a la fecha del juicio en este caso, celebrado el 31 de marzo de 1970, tenía diez años de edad. La peticionaria declaró que su referido marido y padre de Terry Ann, se había ido de Chicago y hacía nueve años que no lo veía. [6] Hay prueba de los demandados, no controvertida, que demuestra que, además de Lisa Jane y de Terry Ann, la peticionaria tuvo otro hijo de otro hombre, [7] que no era ni de Julio Meléndez, de quien ella sólo tuvo

de mayo de 1973, respectivamente, por una votación dividida del Tribunal, cuatro (4) a cuatro (4) y un Juez abstenido. Los Jueces Asociados Señores Dávila, Rigau, Torres Rigual y Martínez Muñoz votaron en contra de las reconsideraciones; y el Juez Presidente Señor Pérez Pimentel (que originalmente se había abstenido) y los Jueces Asociados Señores Martín, Cadilla Ginorio e Irizarry Yunqué, disintieron. El Juez Asociado Señor Díaz Cruz no intervino. El Señor Juez Presidente, con fecha 18 de mayo de 1973 escribió un voto explicativo el cual lee así:

"Considero que debió reconsiderarse la sentencia de este Tribunal y devolverse el caso al Tribunal Superior para la celebración de una vista, y, luego se determinara lo que más convenga al bienestar de la niña envuelta en este proceso.

"No creo que la sentencia apelada responda a este criterio. Tanto por la exposición de la teoría de la madre demandante como por el contexto mismo de la sentencia apelada, ésta se funda más bien en el peso y alcance que el tribunal sentenciador dio a las órdenes y decretos de una corte de Illinois, que en forma alguna adjudicaban la custodia de la menor a base de su bienestar."

[6] T.E. págs. 37 y 38.

[7] T.E., declaración de la testigo América Ortíz, que comienza a la pág. 80, cita específica a la pág. 86.

a Lisa Jane, ni del padre de Terry Ann, con quien la peticionaria admitió que sólo tuvo a ésta.

La peticionaria admitió, que Lisa Jane estuvo con ella en Chicago hasta que tuvo nueve meses de edad; [8] y que, después de esos nueve meses, la niña estaba en Puerto Rico con sus abuelos, los esposos demandados y recurrentes. [9]

Es conveniente recordar aquí que la niña vino de Chicago a Ponce, Puerto Rico, en dos ocasiones. La primera vez fue cuando tenía nueve meses de nacida, allá para fines del mes de abril de 1965; y la segunda vez fue allá para principios del año 1968, para la fecha de los procedimientos sobre hábeas corpus que se iniciaron por la peticionaria en la Corte de Circuito del Condado de Cook, en Illinois, y a los cuales nos referiremos detalladamente más adelante.

En cuanto a la primera vez que vino, nos preguntamos: ¿Cómo, a los nueve meses de nacida, llegó la niña desde Chicago a Ponce, Puerto Rico, a poder de sus abuelos, los demandados recurrentes?

De todo su interrogatorio directo no surge ni aparece cómo fue que la niña vino a Puerto Rico, al hogar de sus abuelos, en Ponce, en ese primer viaje.

En el contrainterrogatorio, a preguntas del Lcdo. Malavet, de si después de los nueve meses de nacida en que ella la tuvo consigo en Chicago, había permanecido allí o fue enviada a Puerto Rico, contestó: "Ella estaba en Puerto Rico"; [10] y que después de esa fecha, desde los nueve meses, estuvo con su abuela Celia Meléndez. [11] Tampoco de esas contestaciones suyas, relativas a este primer viaje de la niña a Puerto Rico, surge cómo fue que vino. [12]

---

[8] T.E. pág. 27: "Ella estuvo conmigo hasta que tuvo nueve meses de edad".

[9] T.E. págs. 27 (última línea) y 28.

[10] T.E. pág. 28.

[11] T.E. pág. 28 ("Hasta donde yo sé, sí").

[12] La peticionaria, fuera de su declaración, no presentó ningún otro testigo.

Pero leyendo detenidamente las declaraciones de los testigos de los abuelos demandados, para determinar cómo fue que la niña vino a Puerto Rico la primera vez, encontramos la declaración jurada de Flor Meléndez, el abuelo político de la niña, quien declaró que la tiene consigo desde el mes de abril de 1965; ([13]) con motivo de que Phyllis y Julio la enviaron a su hogar; ([14]) que ellos no vinieron a Puerto Rico a traerla sino que la enviaron con un sobrino de él que estaba en Chicago, ([15]) llamado Alberto Meléndez; que la enviaron voluntariamente; ([16]) y que durante todo ese tiempo, desde abril de 1965 hasta el día en que se celebró la vista del caso en Ponce, la tenían él y su esposa ([17]) en su hogar y residencia en la Calle N-16, doble A, en la Urbanización "Glenview Gardens", en Ponce, Puerto Rico. ([18])

Alberto Meléndez, el sobrino de Flor Meléndez, a quien éste en su declaración se refirió como la persona que trajo la menor a Puerto Rico en abril de 1965, declaró como testigo de los demandados ([19]) y dijo que en dicha fecha él venía para Puerto Rico desde Chicago; que los padres decidieron mandar la nena para Puerto Rico, con dicho testigo ". . . porque ella no podía tenerla allá"; ([20]) que fueron con él hasta el aeropuerto; que Julio se quedó en la sala de espera y Phyllis, la madre, le pidió permiso a la camarera para entrar hasta el asiento de él para entregársela; que entró y fue hasta su asiento y le hizo entrega de la niña ([21]) y él la trajo a Puerto Rico, al hogar de los abuelos Flor Meléndez y Celia Cruz, entregándosela a ellos; que la niña venía vestida regular-

---

([13]) T.E. pág. 44, línea 4.

([14]) T.E. pág. 44, líneas 7 y 8.

([15]) T.E. pág. 44, líneas 9 a 15.

([16]) T.E. pág. 22, línea 19.

([17]) T.E. pág. 44.

([18]) T.E. págs. 44–45.

([19]) T.E. págs. 77, *et seq.*

([20]) T.E. págs. 77–78.

([21]) T.E. pág. 78.

mente ". . . un poco mal vestida verdad, pero la enviaron así." ([22])

A mostrársele al testigo un objeto (que el juez sentenciador, para fines del récord, describió como ". . . un pequeño zapato tenis") ; ([23]) y preguntársele si recordaba qué era eso que se le mostraba, contestó: "Esto era lo que tenía puesto." ([24]) La demandante manifestó no tener objeción a que se admitiera como prueba y fue marcado Exh. 1 ([25]) y está unido al expediente ante este Tribunal. A esa fecha, todavía los abuelos conservaban uno de los zapatos tenis que la niña usaba seis años atrás, cuando vino por primera vez a Puerto Rico.

Cuando declaraban Flor Meléndez y su sobrino Alberto Meléndez, sobre la forma en que la niña fue enviada a Ponce, Puerto Rico, por primera vez, por Phyllis Rosell, el récord demuestra que ésta estaba presente en sala, oyendo la declaración; y no ocupó luego, en turno de refutación, la silla de los testigos, para desmentir o refutar esa afirmación de Alberto Meléndez; ni tampoco aparece de su declaración como testigo suyo, que ella explicara cómo la niña vino a Puerto Rico, en su primer viaje a la Isla. Lo declarado por esos dos testigos sobre un hecho tan importante, no fue desmentido ni refutado por la señora Rosell; por lo cual, entendemos que fue admitida por la madre. No había fundamento para no darle crédito. En *Cintrón* v. *Cintrón*, 70 D.P.R. 770 (De Jesús) (1950), dijimos:

". . . pero no podemos cerrar los ojos a la realidad de que ante la declaración de la testigo Carmen María Cintrón, en presencia de la demandada y su esposo, cualquier persona razonable de ser falsa la declaración, hubiera ocupado la silla testifical para desmentirla."

---

([22]) T.E. pág. 78.

([23]) T.E. pág. 79.

([24]) T.E. pág. 79.

([25]) T.E. pág. 79.

El récord demuestra que no había base alguna para dudar de la declaración de Alberto Meléndez y su tío en relación con la forma que la niña vino a Puerto Rico por primera vez. Aparte que no fue desmentida ni refutada por la peticionaria al no ocupar la silla testifical para tales fines, tampoco aparece de su declaración como testigo suyo, como hemos expresado antes, que ella explicara cómo la niña vino a Puerto Rico, por primera vez. La declaración de esos dos testigos, sobre un hecho tan importante en este caso, fue pues admitida por la peticionaria. No había, por tanto, razón ni fundamentos para no darle crédito.

La peticionaria declaró que vino a Puerto Rico como tres años antes del juicio, (26) por lo cual, ese viaje tuvo que efectuarse allá para el mes de marzo o abril de 1967; o sea, dos años después de estar la niña con sus abuelos en Ponce, Puerto Rico. Flor Meléndez declaró que ese viaje de ella a Puerto Rico fue en 1967. (27) La peticionaria admitió que en ese viaje a Puerto Rico, estuvo viviendo en la casa de los demandados esposos Meléndez; (28) "unos pocos días", "tres o cuatro días". (29) Flor Meléndez declaró que estuvo residiendo con ellos aproximadamente un mes. (30)

Fueran tres o cuatro días o un mes que ella vivió en casa de los esposos Meléndez, en este viaje suyo del 1967, lo cierto es que ella admitió que la había visto dos veces; (31) que le tomó retratos; (32) que salió con la niña una vez. (33) Flor Meléndez declaró que la peticionaria salía con la niña ". . . hasta pescar al río"; "al río Maraguez". (34) El Lcdo. Cuprill,

---

(26) T.E. pág. 22. (El juicio se celebró el 31 de marzo de 1970.)

(27) T.E. pág. 45.

(28) T.E. pág. 29, línea 24.

(29) T.E. pág. 30, líneas 2 y 5.

(30) T.E. pág. 47.

(31) T.E. pág. 30.

(32) T.E. pág. 30.

(33) T.E. pág. 30.

(34) T.E. pág. 47.

en el contrainterrogatorio de Flor Meléndez, le mostró a éste, una fotografía y le pregunta: "Y mostrándole ahora esta otra fotografía, estas personas que aparecen en esta segunda fotografía? Y él contesta: Aquí está la nena y está Julio y ella." Le vuelve a preguntar: "Y la madre?" Contestación: "Si, señor. Eso fue en casa." "Fue en mi casa." [35]

La peticionaria declaró en relación a unas alegadas gestiones que hizo, durante esta primera visita a Puerto Rico, en la oficina de Asistencia Legal en San Juan, en la oficina de Relaciones de Familia para tratar de conseguir la niña; pero son simples manifestaciones de ella, sin estar sostenidas por prueba o certificaciones de las alegadas agencias, ni haberse probado que radicara acción legal en corte. Pero lo cierto es que, cuando regresó de Puerto Rico a su hogar en Chicago, se fue en el mismo avión, acompañada de Julio Meléndez, [36] el padre de la niña, que para esa época estaba en Ponce, Puerto Rico, en el hogar de sus padres y abuelos de Lisa; durante los tres o cuatro días que la peticionaria estaba viviendo en Ponce, en ese mismo hogar, y donde dormía y se alimentaba, según surge de la prueba. Esta demuestra que al año de haber ocurrido estos hechos, los abuelos le enviaron la niña a su señora madre, allá para el 1968, para que la tuviera con ella tres meses. Ella admitió en la silla de los testigos que Julio le llevó la niña ". . . con un papel que decía que la podía tener tres meses . . . ."; pero que dijo, ". . . nadie me puede decir a mí cuanto tiempo yo puedo tener a mi hija." [37]

Al mes de estar con la madre en Chicago, la niña fue traída para Puerto Rico. La madre declaró que Julio, "se la llevó de mi casa mientras yo estaba trabajando"; [38] y que él

[35] T.E. pág. 69.
[36] T.E. pág. 30, líneas 20, 21, 22, 23, 24 y 25.
[37] T.E. págs. 28 y 29.
[38] T.E. pág. 20.

le dijo al Juez Egan, en Chicago, que se la había traído para Puerto Rico. (39)

Cuando se la enviaron por tres meses, los abuelos la tenían bajo su custodia desde que vino por primera vez a Puerto Rico, de nueve meses de nacida, allá para fines del mes de abril de 1965, o sea, desde hacia alrededor de tres años; y el hecho de enviársela a la madre para que la tuviera por esos tres meses, no demuestra que perdieran la custodia de la niña; y, por el contrario, lo que demuestra es que los abuelos tenían esa custodia.

Basándose en ese hecho de haberla Julio traído de vuelta a Puerto Rico, al mes, motivó que la madre iniciara los procedimientos de hábeas corpus, en la Corte de Circuito del Condado de Cook, en Illinois. Hemos examinado detenidamente los documentos obrantes en autos, en relación con dicha acción en el referido tribunal. No hemos encontrado entre ellos copia de la petición de hábeas corpus radicada en la Corte del Condado de Cook. Sí aparece copia de una orden de fecha 27 de mayo de 1968, (40) en la cual se ordena por el Juez de dicha Corte Sr. Edward J. Egan, que se expida un auto de hábeas corpus dirigido a Julio Meléndez, requiriéndole que produzca el cuerpo de Lisa Jane Meléndez, ante él, en el salón de sesiones de dicha corte, a las 9:30 A.M., del día 29 de mayo de 1968, para oír las razones por las cuales tenía detenida a Lisa. Aparece una copia de otra orden dictada por el Juez Egan con fecha 29 de mayo de 1968 (41) (fecha para la cual fue requerido a comparecer con Lisa), de la cual aparece que dicho Juez expresa que ambas partes comparecieron y testificaron; pero que Julio falló en traer a Lisa ante la corte; por lo cual ordenó que Julio A. Meléndez produjera el cuerpo

---

(39) T.E. pág. 20. Del récord no aparecen las razones que tuvo Julio para traérsela para Puerto Rico, antes de haber expirado los tres meses por los cuales los abuelos se la enviaron para que la tuviera con ella.

(40) Véase folio 10 del expediente ante la Corte de Ponce.

(41) Véase folio 9 expediente del caso.

de Lisa ante la Corte el día 12 de junio de 1968, a las 9:30 A.M.; y prohibió a Julio que interfiriera con la libertad personal de Phyllis Jane Rosell; y que fuera a la casa de ésta o al sitio donde ella trabajaba. Llegado ese día, hay una orden del Juez Egan, de ese mismo día 28 de junio de 1968, en la cual se expresa que ambas partes comparecieron con sus respectivos abogados y declararon; que Julio A. Meléndez falló en producir el cuerpo de Lisa ese día; por lo cual lo declara culpable de desacato al tribunal y lo condena a cumplir un año de cárcel; fijándole una fianza de $20,000.00 para el caso de apelación. (42)

Entre los documentos en autos, de la Corte de Cook, no aparece ninguno que represente la sentencia final en el caso de hábeas corpus, de donde pudiera aparecer que dicha corte pasó y determinó sobre la cuestión de la custodia y el bienestar de Lisa. No hay en los autos ni en los documentos de la Corte de Cook, el más leve y fugaz asomo de prueba, que ésta concediera a la madre dicha custodia. La afirmación del tribunal, en su determinación de hecho número 3, de que el Tribunal de Cook ordenó a Julio A. Meléndez que le entregara la menor a la peticionaria carece de todo fundamento en la prueba. Todo lo que ordenó fue que trajera la menor ante la presencia del tribunal; y de los documentos mencionados todo lo que surge es que Julio fue condenado por desacato por no haberla llevado ante dicha Corte.

Y es natural que la Corte de Cook no pasara sobre el bienestar y la custodia de la menor en un caso en que los abuelos que la tenían bajo su cuidado y custodia desde hacia varios años no eran parte ni fueron emplazados, y estaban en Puerto Rico, fuera de la jurisdicción de la Corte de Illinois.

Basándose en las referidas órdenes de la Corte de Circuito del Condado de Cook, en Illinois, Phyllis Rosell viene a Puerto Rico, y radica en la Sala de Ponce del Tribunal Superior de

---

(42) El juez de instancia expresa en su determinación de hecho número 5, que aparentemente Julio apeló de la condena.

Puerto Rico, el caso de hábeas corpus que es motivo de esta disidencia. Estamos enteramente de acuerdo con el Juez Presidente, Señor Pérez Pimentel, en su voto explicativo del 18 de mayo de 1973, (43) de que tanto de la teoría expuesta por la demandante, como del contexto de la sentencia se desprende que ésta se funda más bien en el peso y alcance que el tribunal sentenciador dio a las órdenes y decretos de la Corte de Cook, que en forma alguna adjudicaban la custodia de la menor a base de su bienestar. Veamos: después de hacer relación a las referidas órdenes, alega que ha tratado infructuosamente que se cumpla con las mismas, pero que Julio (44) y los abuelos codemandados se han negado a devolverle la niña. Repetimos: ¿Cómo podían éstos estar obligados por dichas órdenes en un caso en que no fueron partes, ni fueron emplazados y estaban residiendo en Puerto Rico?

Claramente se desprende de esas alegaciones ante la Sala de Ponce, que la acción se ejercitó para que ésta pusiera en vigor la alegada orden u órdenes del Tribunal de Illinois en que supuestamente se ordena que se le entregue la custodia de la menor a la aquí peticionaria. Que ésa fue la intención específica y clara de la petición de hábeas corpus lo confirma y comprueba lo expresado por el Lcdo. Cuprill, antes de entrar a oír la prueba en este hábeas corpus, cuando se expresó así:

"Sr. Juez, a nosotros nos gustaría tratar de ilustrar a la Corte sobre lo que estamos solicitando porque veo que la contestación está levantando unas cuestiones que son completamente improcedentes.

En primer lugar, en este caso se trata de una petición *para que se ponga en vigor unas órdenes que han sido emitidas por un Tribunal de Chicago del Condado de Cook* en un caso precisamente sobre Habeas Corpus habido entre las partes, (45) cuyas

---

(43) Véase dicho voto al escolio 5 de la pág. 332 de esta opinión.

(44) Recuérdese que Julio no fue nunca emplazado ni notificado; y el caso se llevó solamente contra los abuelos.

(45) Volvemos a repetir que en el caso ante el Condado de Cook no fueron parte los abuelos. Se llevó la acción solamente contra Julio Meléndez,

órdenes fueron acompañadas con la petición en este caso y de las cuales surge que este Tribunal de Chicago tenía jurisdicción sobre las partes y que se emitieron órdenes por este Tribunal de Chicago relacionada [*sic*] con la custodia de la menor y que en abierta violación de esas órdenes del Tribunal de Chicago, esa menor fue sacada de la jurisdicción de ese Tribunal y traída a Puerto Rico con la oposición de la madre que había sido favorecida por la orden del Tribunal de Chicago." (Bastardillas nuestras.)

La propia sentencia del Tribunal de Ponce, demuestra, como bien expresó el Juez Presidente Señor Pérez Pimentel en su referido voto explicativo, que el juez sentenciador descansó en el peso y alcance que éste le dio a las órdenes de la Corte de Illinois, en las cuales ". . . en forma alguna adjudicaban la custodia de la menor a base de su bienestar."

En la primera parte de la relación del caso expuesta por el juez sentenciador, en su referida sentencia, expresa que en la petición radicada se alega que el demandado y sus padres retienen a la menor en Ponce ". . . en abierta violación de una resolución de la Corte de Circuito del Condado de Cook, Illinois. . . ." y en las determinaciones de hechos números 3, 4 y 5 se refiere específicamente a los procedimientos de la Corte de Cook; y a que en abierta violación a lo ordenado Julio se trajo a la menor a Puerto Rico; y en la conclusión de derecho número 2 y 3 concluye que el derecho a la custodia de la menor fue adjudicado a favor de la madre por un tribunal competente quien a la fecha de su orden del 27 de mayo había adquirido jurisdicción sobre la menor y sus padres; y que no se puede burlar la jurisdicción de un tribunal para no hacer efectivas sus órdenes mediante el traslado ilegal de la menor fuera de los límites territoriales de dicha Corte; expresando además, en su conclusión de derecho número 3 que:

el cual nunca fue emplazado en la acción radicada en Ponce; de manera que las partes aquí son los abuelos y contra ellos se quiere poner en vigor alegadas órdenes de la Corte de Cook; donde no fueron partes y sí Julio solamente.

"La orden de 27 de mayo de 1968 de la Corte de Circuito del Condado de Cook, estado de Illinois, firmada por el Hon. Edward J. Egan *le merece entero crédito y reconocimiento a este Tribunal.*" (Bastardillas nuestras.)

Todo lo que hemos expuesto anteriormente demuestra que todo este procedimiento, todo el pensamiento de la demandante y el juez sentenciador, estuvieron permeados por la alegada orden de la Corte de Cook; y tuvo el propósito de que se le diera entero crédito y reconocimiento y se le hiciera cumplir en Puerto Rico, contra los abuelos.

Sobre la cláusula de entera fe y crédito el Tribunal Supremo del propio Estado de Illinois no le dio valor ni aplicación en el caso de *People Ex Rel. Strand* v. *Harnetiaux*, 263 N.E.2d 30, resuelto el 7 de octubre de 1970.

En este caso estaba envuelta la custodia de un menor. Su madre es la demandante en el recurso de hábeas corpus. Los abuelos paternos del menor son los demandados. Los padres del menor vivían en California en 1966, cuando el padre radicó demanda de divorcio en la Corte Superior del Condado de Los Angeles. El tribunal concedió el divorcio; y al dictarse la sentencia, el padre tenía la custodia del menor; pero el tribunal concedió la custodia a la madre, sujeta a los derechos del padre de visitarlo. Poco después, el tribunal modificó su orden de custodia, a moción del padre, y después de una vista, concedió la custodia al padre, sujeta a los derechos de visita de la madre. El tribunal también autorizó al padre a llevarse al menor a la residencia de sus abuelos paternos, en el Estado de Illinois, pero autorizó a la madre a tener al menor con ella, en el mes de julio, durante el verano. De ahí en adelante el padre y el menor su mudaron para el Condado de Bond, en Illinois, a vivir con los abuelos paternos, los demandados en el caso de Illinois que comentamos.

Unos meses después el padre del menor murió en un accidente de automóvil en Illinois. Posteriormente, la madre vino a Illinois y los abuelos le negaron permiso para ver a su hijo. Luego los abuelos radicaron un procedimiento de custodia del menor en la Corte de Circuito del Condado de Bond, en Illinois, y sin notificar a la madre, ellos fueron nombrados tutores (*guardians*) de la persona y los bienes del menor. Dos meses después, la madre radicó una moción dentro del caso de divorcio en la Corte Superior del Condado de Los Angeles, California, pidiendo que se modificara el decreto de divorcio y se le concediera a ella la custodia del niño. Los abuelos fueron notificados de dicha solicitud por correo certificado, pero ellos no fueron emplazados y ninguno de ellos ni el menor estuvieron ante el Tribunal de California. Este modificó el decreto de divorcio y le concedió la custodia del niño a la madre. Basándose en esa actuación del Tribunal de California, la madre radicó un hábeas corpus en la Corte de Circuito del Condado de Bond, en Illinois, pidiendo se le concediera la custodia del menor basada en que la orden de California merecía entera fe y crédito (*full faith and credit*) o, alternativamente, a razón de que ella era competente para conducir sus propios negocios y era una persona preparada (*fit*) y por lo tanto tenía derecho a la custodia como madre que era del niño. Después de contestar los abuelos, la madre demandante solicitó se dictara sentencia sumaria a su favor sobre la base de que la más reciente orden dada en California, que le concedió a ella la custodia del niño, merecía entera fe y crédito. La Corte de Circuito del Condado de Bond concedió y dictó la sentencia sumaria solicitada por la madre, a favor de ésta.

Los abuelos demandados apelaron para la Corte de Apelaciones, y de acuerdo con la ley vigente, la apelación fue trasladada al Tribunal Supremo de Illinois. Ante este Tribunal, los argumentos de las partes se enfocaron sobre el problema de si bajo la ley de California, por la muerte del padre se

terminó la jurisdicción de la Corte de California que decretó el divorcio, para modificar, como modificó, el decreto sobre la custodia del menor. El Tribunal Supremo de Illinois decidió que no tenía que resolver esa cuestión, porque considerando que conservara o no su jurisdicción la Corte de California, para modificar su decreto de custodia, o su resolución u orden haciéndolo, no había que darle completa fe y crédito por los tribunales de Illinois. Resuelve el alto Tribunal de dicho Estado que la extensión hasta donde la cláusula de completa fe y crédito (*full faith and credit*) de la Constitución Federal sobre las órdenes o decretos cubre custodia de menores, no había sido delineada o determinada conclusivamente; y que, indudablemente, era todavía una cuestión abierta de si esa cláusula se aplicaba de todas maneras y por completo a los decretos sobre custodia de menores. ([46])

Los decretos sobre custodia de menores no enmarcan bien, si en verdad aplicasen, dentro de los objetivos de la cláusula de entera fe y crédito. Expresa el Tribunal que esa cláusula, adoptada en una época en que la concesión de divorcios legislativos, más bien que judiciales, era la práctica, tuvo como propósito el que el carácter federal de la nación no fuera explotado por litigantes decepcionados que podrían relitigar en un Estado cuestiones previamente decididas por la Corte de otro Estado; y que el deseo de ponerle fin a las cuestiones litigadas, no obstante, está a menudo en conflicto con los mejores intereses del menor que siempre ha sido la principal preocupación del decreto sobre su custodia. ([47]) Expresa el

---

([46]) "The extent to which the full faith and credit clause of the Federal Constitution embraces child custody decrees has never been conclusively delineated; indeed it is still an open question whether the clause is applicable to child custody decrees at all. (*New York ex rel. Halvey* v. *Halvey* (1947), 330 U.S. 610, 67 S.Ct. 903, 91 L.Ed. 1133; *Kovacs* v. *Brewer* (1958) 356 U.S. 604, 78 S.Ct. 963, 2 L.Ed.2d 1008) (*People Ex Rel. Strand*, supra).

([47]) "The child custody decree fits uneasily, if at all, into the objectives of the full-faith-and-credit clause. That clause, adopted when legislative rather than judicial divorces were the practice, was intended

más alto Tribunal de Illinois, que la Corte Suprema Nacional expresamente ha dejado abierta la cuestión de si la cláusula de entera fe y crédito se aplica o no a los decretos sobre custodia; y que ha reconocido que casi todos los Estados permiten la modificación de un decreto de custodia si es en beneficio y los mejores intereses del menor; y cita el caso de *Kovacs* v. *Brewer*, 356 U.S. 604; 78 S.Ct. 963; 2 L.Ed.2d 1008; del Tribunal Supremo nacional, donde éste expresó que: "Cualquier efecto que la cláusula sobre entera fe y crédito pueda tener con respecto a decretos de custodia es claro . . . 'que el Estado del foro tiene por lo menos tanta libertad de acción para desechar el decreto o fallo, cualificarlo o separarse de él, como lo tiene el Estado donde fue rendido.' " (48) (Traducción nuestra.)

Expresa el Tribunal Supremo de Illinois que Nueva York ha adoptado expresamente el punto de vista de *que el bienestar* del niño debe siempre prevalecer sobre la política de unidad nacional contenida en la cláusula de entera fe y crédito y que, por tanto, no es necesario darle siempre entera fe y crédito a un decreto de custodia de un Estado hermano. (49)

Expresa el Tribunal Supremo de Illinois que en ese caso la madre fue privada de la custodia física del menor por la orden de la Corte de California y desde entonces ha residido y vivido en la casa de los abuelos demandados, excepto durante el mes de julio de 1967. Ni el menor ni los abuelos demandados, no obstante, fueron oídos en la vista en la Corte

---

to insure that the federal character of the nation should not be exploited by disappointed litigants who would relitigate in one State issues previously decided by the courts of another. This desire for finality, however, is often in conflict with the best interests of the child which has always been the paramount concern of the child custody decree." (People Ex Rel. Strand, supra.)

(48) "Whatever effect the Full Faith and Credit Clause may have with respect to custody decrees, it is clear . . . 'that the State of the forum has at least as much leeway to disregard the judgment, to qualify it or to depart from it as does the State where it is rendered'."

(49) Véase: *Bachman* v. *Mejías* (1956), 1 N.Y.2d 575; 154 N.Y.S.2d 903; 136 N.E.2d 866.

de California, para concederle la custodia a la madre; y que cree que cualquier determinación que pretenda estar guiada por los mejores intereses del niño está bajo un serio impedimento cuando *éste y las personas* con la cuales él ha estado viviendo no están presentes; y que la indeseabilidad de descansar sobre la prueba formal de una orden de una corte en un caso como éste ha sido puntualizada. ([50])

Sostiene el más alto Tribunal de Illinois que en ese caso, existe por lo menos grave duda sobre si el Tribunal de California podía ejercer jurisdicción sobre el menor, y aun una más seria cuestión sobre si la Corte de California adquirió jurisdicción sobre los abuelos demandados. Resolvió el Tribunal que no empece la orden del Tribunal de California dándole la custodia a la madre, correspondía al Tribunal de Illinois resolver el caso en su fondo, sin tomar en consideración la doctrina de entera fe y crédito a darse al decreto del Tribunal de California; por lo cual revocó la decisión de la Corte de Circuito del Condado de Bond; devolviendo el caso para que se continuaran los procedimientos.

Eliminado de la sentencia el fundamento de darle entera fe y crédito a los procedimientos de la Corte de Cook, ¿qué queda de la misma, conforme a la prueba, para sostener que los mejores intereses y el bienestar de la menor deben inclinar al Tribunal a concederle la custodia de ésta, y entregársela, a la madre? A nuestro juicio, y con el mayor respeto al tribunal sentenciador y al criterio de otros Magistrados de este Tribunal, no queda nada, absolutamente nada. Más adelante, cuando examinemos la prueba, nos explicaremos.

En *Rodríguez v. Gerena*, 75 D.P.R. 900 (Sifre) (1954) resolvimos que las disposiciones del Código Civil que establecen que en todos los casos de divorcio los hijos serán puestos bajo el cuidado y patria potestad de la parte que obtiene el divorcio, ". . . no destruye ni restringe el poder de los tribu-

---

([50]) Ver: Paulsen and Best, *Appointment of a Guardian in the Conflict of Laws,* 45 Iowa L. Rev. 212, 226.

nales para adoptar las medidas necesarias en cuanto a la custodia de los hijos menores, con el fin de lograr *y de proteger su bienestar y sus mejores intereses.*" (Bastardillas nuestras.) Expresamos que no obstante esas disposiciones del Código Civil "... una corte de justicia en el ejercicio del poder de *parens patriae,* tiene autoridad para darle la custodia de tales hijos a la parte perdidosa en acción de divorcio, si se le demuestra que es ésa la medida más conveniente para ellos. Dichas disposiciones expresan una norma general, *que está subordinada a la regla de que la consideración primordial es el superior interés público del bienestar de los hijos, de mucha más importancia que cualquier derecho correlativo a la custodia.*" (Bastardillas nuestras.)

En *Castro* v. *Meléndez,* 82 D.P.R. 573 (Blanco Lugo) (1961) sostuvimos la anterior doctrina cuando dijimos: "En un recurso como el presente la misión del Tribunal, en el ejercicio del *parens patriae* del Estado, es determinar a quien corresponde la custodia de los hijos menores *guiado principalmente por el bienestar y conveniencia de éstos.*([51]) (Bastardillas nuestras.)

En *Chabert* v. *Sánchez,* 29 D.P.R. 241 (1921), fue la primera vez que se usó el recurso extraordinario de hábeas corpus para determinar la custodia de un menor. Allí dejamos sentada la referida doctrina de que en recursos de esta naturaleza, *el bienestar del menor* es el elemento predominante a considerar. Reafirmamos este criterio en *Fernández* v. *Martínez,* 59 D.P.R. 548 (1941); *Ríos* v. *Lafosse,* 59 D.P.R. 509 (1941); *Chardón* v. *Corte,* 45 D.P.R. 621 (1933); *Llopart* v. *Mesorana,* 49 D.P.R. 250 (1935); *Babá* v. *Rodríguez,* 36 D.P.R. 502 (1927); *Rodríguez* v. *Gerena,* supra; *Castro* v. *Meléndez,* supra. Esta doctrina es universal, tanto en las jurisdicciones estatales como federales.([52])

---

([51]) Véanse los diferentes casos allí citados.

([52]) Véase el caso de *Kovacs* v. *Brewer,* de la Corte Suprema de los Estados Unidos, supra; donde se recalca, a través de toda la opinión, que

El tribunal sentenciador, en su conclusión de derecho número 4 estableció: "El cariño y amor de la madre no puede ser sustituído por el de los abuelos."

Naturalmente que el cariño y amor de una madre es el sentimiento humano más bello y profundo que existe en la tierra. El famoso poeta italiano D'Amicis lo expresó en versos inmortales en que la novia le pide a su novio que como prueba de su amor le traiga el corazón de su madre. Este va y le arranca la noble entraña a su madre; y con él ensangrentado en su mano corre a llevarlo a la novia, pero, por el camino se cae y en ese momento oye que el corazón de la madre le pregunta: ¿te has hecho daño, hijo mío?

Pero, ¿qué base hay en la prueba para sostener que en este caso, el amor y cariño de la madre no puedan ser sustituidos por el de los abuelos? El récord demuestra que el Lcdo. Cuprill le hace a la Sra. Rosell la siguiente pregunta: ¿Por qué quiere usted recobrar la custodia de su hija? Y ella contestó: "Porque es mi hija y la quiero tener conmigo." ([53])

Después de tantos años de estar la niña con sus abuelos, la madre quiere que se le conceda la custodia meramente porque es su hija. ¡Que contraste con la declaración de doña Celia, la abuela paterna demandada! A pregunta de su abogado Lcdo. Malavet, de si ella quiere a la niña, exclama: "La quiero más que a mi vida. Creo que ella no puede quererla más que yo porque ella solamente la tuvo por nueve meses y ella la tenía de sitio en sitio." ([54]) Y luego expresa: *"Yo soy la madre porque la crié y he velado por mi hija cuando se enferma."* ([55]) (Bastardillas nuestras.) Estas patéticas expresiones de la abuela, salidad de lo más profundo de su alma,

---

la cuestión más importante, en casos de custodia de menores, no es un decreto de una Corte de otro estado, sino cuáles son los mejores intereses para el bienestar del menor.

([53]) T.E. pág. 23.

([54]) T.E. págs. 87 y 88.

([55]) T.E. pág. 88.

nos hace recordar unas redondillas de El Caribe, ([56]) donde contestándole a Palació, le dijo: "Pero diré en voz muy alta,—que en esta Borinquen mía—*toda la que es madre cría . . . .*" (Énfasis en el original.)

Aquí se enfrentan una madre "sicológica" que desde que la niña tenía nueve meses de edad, allá para fines del mes de abril de 1965, la tiene en su poder y bajo su custodia hasta la fecha de radicación del hábeas corpus, en Ponce, el 23 de marzo de 1970 y para la fecha de la vista del recurso el día 31 de marzo de 1970 y de la sentencia que fue dictada el 11 de septiembre de 1970, ó sea, por más de cinco años; y todavía la tiene bajo su custodia a la fecha de la sentencia de este Tribunal y de esta opinión disidente, 25 de octubre de 1973; ó sea, que la ha tenido consigo por más de ocho años; y una madre biológica, que con excepción de los primeros nueve meses de nacida, no la ha tenido bajo su custodia. Esta situación ha sido motivo de hondos estudios y preocupación de parte de juristas, sicólogos, sociólogos y otras autoridades sobre la materia.

Un padre sicológico se refiere a la persona con quien el niño mantiene ese tipo de relación evidenciada por el tipo de afectos que normalmente se encuentran en relación de padre-hijo. ([57])

Sostienen las autoridades que la presente es una época en que el efecto del medio ambiente sobre el desarrollo sicológico de una persona ha sido reconocido por los tribunales igual que por los sicólogos. Se ha sostenido que como la estabilidad del medio ambiente del niño es tan importante, en una disputa sobre su custodia entre el padre y el abuelo ". . . los tribunales

---

([56]) José Gualberto Padilla: *Para un Palacio un Caribe.* Editorial del Departamento de Instrucción Pública del E.L.A., 1956; pág. 34.

([57]) "A psychological parent refers to the person with whom the child maintains that type of relationship, as evidenced by the type of affection which is normally found in the parent child relationship." (Miss. L. J., John L. Hunter, *Child Custody.—Rebutting the Presumption of Parental Preference,* Vol. XLIII, No. 2, págs. 252–53, 254.)

prefieren no cambiar la custodia . . . cuando hacerlo rompería lazo familiares (*home ties*) de mucho tiempo." ([58])

El hecho es que los mejores intereses del niño deben ser la prueba básica para determinar su custodia. La presunción de que el mejor interés y bienestar del niño está con su padre o madre no se sostiene en pie a la luz de un examen o escrutinio sicológico. Esta presunción pasa por alto la presente relación que existe entre el niño y su padre sicológico. Esta clase de relación promueve el desarrollo normal de la niñez. Aunque al nacimiento la potencialidad de este tipo de relaciones puede ser mayor entre el padre (o madre) biológica y el niño, después de la prolongada interacción con otra figura padre-madre, la estabilidad emocional del niño puede ser mejor protegida dejando su custodia con el padre-madre sicológico en vez de concederle la custodia al padre o madre biológico. ([59])

En el Yale Law Journal, *Alternatives to "Parented Right" in Child Custody Disputes Involving Third Parties,* Vol. 73:151 (1963), se expresa, ([60]) a la pág. 157:

". . . La preocupación por el bienestar psicológico del niño, en contraste con su bienestar físico o material, está implícita en

---

([58]) Today is an age when the effect of environment upon one's psychological development is being recognized by the courts as well as psychologists. It has been held that since the stability of the child's environment is so important, in a custody dispute between the father and the grandparent, ". . . the courts prefer *not to change custody . . . where to do so would sever home ties of long standing."* (Bastardillas nuestras.) (Ver: Annot., 25 A.L.R.3d 71.)

([59]) "The fact is that the best interest of the child should be the basic test for determining child custody. The presumption that the best interest of the child is with the parents does not always hold up under the light of psychological examination. This presumption overlooks the present relationship which exists between a child and his psychological parent. This type of relationship promotes normal childhood development. Although at birth the potential for this type of relationship may be greater between the biological parent and the child, after prolonged interaction with another parent figure, *the child's emotional stability may best be protected by leaving his custody with the psychological parent rather than awarding custody to the biological parent."* (Bastardillos nuestras.) (Ver: Miss. L. J., Hunter, cita precisa al escolio 57, pág. 349 de esta opinión.)

([60]) Omitimos el original en inglés.

varios de los criterios a que nos hemos referido con relación a la prueba del mejor interés (*best interest test*)—los relacionados con el amor entre el niño y las partes envueltas, los efectos del rompimiento de las relaciones existentes, y el carácter y personalidad de las partes envueltas. Esta preocupación refleja cierta conciencia de parte de algunos tribunales en cuanto a la deseabilidad de conceder la custodia de un niño, principalmente a base de los mejores intereses psicológicos del niño, para realizar el propósito de darle máxima importancia al bienestar del niño."

Y a la misma pág. 157 se dice:

". . . Tanto la doctrina del derecho paternal como los recursos procesales que favorecen al padre natural pueden defenderse en estos términos solamente mediante una generalización psicológica, intuitiva pero incompleta, a los efectos de que un 'lazo de sangre' entre el padre y el niño eventualmente resultará en un amor mayor y mejor y por consiguiente, en un mejor desarrollo psicológico de ese niño. El defecto principal de esta generalización es *que pasa por alto completamente la actual estructura de relaciones del menor*. La interacción mutua entre el niño y adulto, la cual puede describirse en términos tales como, amor, confianza básica, afecto y seguridad, se considera esencial para el desarrollo feliz del niño, y es la base de lo que pudiéramos llamar *paternidad psicológica*. Es esta paternidad psicológica, antes que los sucesos biológicos que puedan precipitar tal relación, lo que muchos psicólogos identifican como una condición *sine qua non* para el desarrollo eficaz de la personalidad. Aunque al nacimiento, puede ser mayor la potencialidad biológica del padre para establecer tal relación, no existe tal falta de equilibrio después que una tercera parte haya tenido la custodia por cierto período de tiempo (Freud Interviews). Después de un período de separación del padre biológico y de haber estado bajo el cuidado de una tercera persona, el niño puede aprender a ver a ésta como su padre psicológico; cualquier relación anterior con el padre biológico puede deteriorarse al extremo de que no solamente será reemplazada, sino también incapaz de ser resucitada. Donde ha ocurrido esto, un cambio en la custodia basado únicamente en la relación biológica, puede al romper la relación paternal psicológica existente, causar un daño emocional considerable al niño; puede hasta causarle un efecto tal que se niegue a entrar en una nueva relación. De esta manera, la generaliza-

ción intuitiva, al no responder por las relaciones presentes, no provee para los mejores intereses del niño en su máxima expresión." (Bastardillas nuestras.)

Sostiene Hunter que la separación de un niño de la custodia de un adulto con el cual ha formado una relación de afecto, le puede ocasionar un trauma de tal naturaleza, que puede ser sicológicamente equivalente, en su detrimento, *a convertirlo en un huérfano.*

La prueba demuestra que cuando el alguacil llegó al hogar de los abuelos demandados, con el fin de emplazarlos, con sólo enterarse la niña del propósito de dicho funcionario, se puso a llorar y dijo que no se iba. [61] Cuando se estaba celebrando el juicio, el ilustrado magistrado que presidió el mismo le pregunta a los abogados que si creían conveniente que la niña permaneciera en sala, porque *"esto podría causarle un trauma emocional a esa niñita.* Podría estar por la galería." [62]

¿Cuál no será el trauma que le ocasionaría cuando el alguacil vaya a arrancarla, a desarraigarla de su ambiente normal y espiritual en que se desenvuelve? Ese ambiente lleno de afecto, cariño, cuidados y mimos en que vive desde los nueve meses de edad. Para llevarla a vivir con personas con quienes no le unen lazos afectivos y espirituales de ninguna clase, que hablan el idioma inglés [63] y no la lengua vernácula de la niña, el español.

En el caso de *N. N. N.* v. *N. N. N.*, 95 D.P.R. 291 (Belaval) (1967), parecido al presente, se trataba de una menor que fue puesta bajo la custodia de su abuela materna desde nacida. (En el nuestro, la menor está bajo la custodia de su abuela paterna y su abuelo político, desde que tenía nueve meses de nacida.) Este Tribunal por voz del ilustre Magistrado Señor Belaval se expresó así:

---

[61] T.E. pág. 52.

[62] T.E. pág. 60.

[63] T.E. pág. 40. (¿Habla español su señora madre? "No".) (El récord demuestra que tampoco la señora Rosell habla español.)

"Creemos que éste es un caso, en el cual, el estado afectivo creado por la tierna convivencia de la infancia, debe mantenerse en ausencia de una prueba clara de verdadero riesgo para el menor. No hace mucho tiempo, resolvimos que el concepto 'bienestar del menor' incluye diversos factores de orden moral, psíquico, cultural y económico y que los intereses humanos envueltos en la determinación de la custodia de menores no permiten que se resuelva un problema de tanta categoría mediante la mera aplicación del concepto jurídico de la patria potestad— *Rodríguez* v. *Torres,* 80 D.P.R. 778 (1958), cita precisa a la página 780. Igual razonamiento nos parece aplicable a una situación como ésta, en que sólo está envuelta la probabilidad de un futuro bienestar a costa de otras ventajas intimistas."

Y en *Muñoz* v. *Torres,* 75 D.P.R. 507 (Ortíz) (1953) dijimos:

"Bien conocido es el poder de 'parens patriae' del Estado con respecto a los niños, a los fines de promover su bienestar, como seres humanos y como ciudadanos potenciales, y de velar por el establecimiento del ambiente más adecuado posible para el desarrollo de su personalidad. El concepto del bienestar de los menores responde a, y en función de, una multiplicidad de factores de carácter moral, psíquico, cultural y económico. Ningún factor o elemento aislado es exclusivo o decisivo, debiendo considerarse la totalidad de las circunstancias envueltas en el caso."

La prueba en este caso demuestra, fuera de toda duda razonable, que, como expresó el ilustrado Juez Señor Belaval, en *N. N. N.* v. *N. N. N.,* supra:

"Existe un verdadero lazo afectivo entre la abuela y su nieto de cuatro años, uno de esos lazos que sólo puede crear la reunión de la inocencia con la sabiduría."

Tanto de las Determinaciones de Hechos y Conclusiones de Derecho, del ilustrado juez sentenciador, como del concepto expresado por el abogado de la peticionaria de que: "Lo que hay que determinar es si ella está en condiciones o no de.tener la custodia de esa niña, de su hija", (64) surge lo profunda-

---

(64) T.E. pág. 37.

mente equivocados que están ambos sobre la doctrina por la cual deben regirse casos de esta naturaleza. Es solamente si los mejores intereses y el bienestar del menor, indican si deben romperse los lazos afectivos, de amor y cariño que existen entre la niña y sus "padres-sicológicos"; y han existido durante largos años; si hay base en la prueba para romperlos y sacar la niña de ese ambiente para llevarla a otro distinto y nuevo, desconocido para la menor, con personas que no representan nada para ella, dado que desde los nueve meses de nacida, cuando no tenía conciencia de las cosas, salió de la custodia de la madre para venir a la de los abuelos demandados. Y nada hay en la prueba, ni en las determinaciones y conclusiones del tribunal que demuestre y convenza a una conciencia no prevenida, de que deben romperse esos lazos, por el bienestar de la menor, para entregársela a la madre biológica.

Es más, el ilustrado juez sentenciador expresó que ordenaría a la trabajadora social del Tribunal Superior, Sala de Ponce, para que realizara una investigación-exhaustiva sobre las condiciones económicas, morales y ambientales de las partes; (⁶⁵) y ese estudio se ordenó y dicha trabajadora social Sra. Carmen A. Renovales de Colón lo hizo y lo rindió al Tribunal, en cuanto a los abuelos demandados, con fecha 29 de junio de 1970, que consta en autos; y a pesar de tenerlo ante sí el juez de instancia, alrededor de tres meses desde que se rindió el referido informe, dicho magistrado no lo consideró y ni siquiera lo mencionó en su sentencia, del 11 de septiembre de 1970, ni en ninguna parte de sus conclusiones de hecho y de derecho.

Sin embargo, dicho informe es luminosamente revelador para no romper esas relaciones entre la niña y sus abuelos. Expresa que visitó ese hogar en la "Urbanización Glenview" en Ponce; que la casa es propiedad del matrimonio y consta de

---

(⁶⁵) T.E. pág. 12.

marquesina, porch, sala, comedor, cocina, tres dormitorios y dos servicios sanitarios; el solar es grande y cercado; la marquesina es larga y sirve para los juegos de la niña con sus amiguitos; toda la casa está equipada con muebles modernos y luce en buen estado; la niña tiene para su uso un dormitorio equipado propiamente y muy bonito; goza hasta la comodidad de un aire acondicionado y un tocadiscos en su dormitorio; el negocio del abuelo le deja $250.00 semanales limpios; que gozan de simpatía en el vecindario y los vecinos le expresaron que eran personas deseables; que el matrimonio de los abuelos lleva 28 años de establecido, y es estable. Esto en cuanto al aspecto material. En cuanto al aspecto espiritual, expresa la trabajadora social que los abuelos desean a la nieta y la *"quieren entrañablemente, cariño que la niña comparte y reciproca";* que Lisa es un niña despierta y conversadora, de seis años, matriculada en primer grado en la escuela La Milagrosa; que se nota consentida ya que es la única pequeña en la familia (el nucleo familiar es de cuatro personas; los dos abuelos, la niña y un hijo de éstos, de 24 años, llamado Rubén); y el único interés de los abuelos que la crían; que observó que la niña tiene de todo, trajes, zapatos, juguetes, en gran cantidad y en buenas condiciones; y concluye en su informe: *"no hay duda de que estos abuelos se desviven por la nieta y en ningún otro lugar tendría la atención que en éste recibe por ser única."* (Bastardillas nuestras.)

El Dr. Maurice Porot, en su obra *La Familia y el Niño* [66] expresa que las relaciones de familia han de estudiarse en función de su incidencia sobre su evolución afectiva, que debe realizarse normalmente hacia una completa autonomía; y que la actitud del hombre frente a la sociedad depende en gran parte de su experiencia familiar. Sostiene que el amor, la aceptación y la estabilidad son las tres columnas de la seguri-

---

[66] Traducción al español, por E. Peñas de Ros, de la edición francesa: L'Enfant Ex Les Relations Familiales, Editorial Luis Miracle, S.A., Barcelona, España, 7a. Ed. enero 1969, pág. 13, *et. seq.*

dad, condición primordial del desarrollo afectivo infantil. La prueba, y especialmente el informe de la trabajadora social del Tribunal de Ponce, demuestran diáfanamente que ésas son las condiciones que la niña en este caso ha encontrado en el hogar de los abuelos. Y este triple lazo es el que se intenta romper por la sentencia que revisamos, para arrojarla en otro ambiente completamente extraño para ella. Si existe un caso en que, contrario a las conclusiones de derecho del juez de instancia, el amor de madre ha sido sustituido, como cuestión de hecho, por el amor de los abuelos, el presente es un ejemplo claro, diáfano, pleno de calor humano.

Las autoridades sobre la sicología y la siquiatría infantil citadas por los recurrentes y que hemos tenido la oportunidad y el privilegio de leer, [67] están unánimamente de acuerdo en la enorme importancia que tiene para el desarrollo emocional y afectivo y la personalidad de los niños los primeros seis o siete años de éstos; justamente los mismos años que lleva Lisa con sus abuelos.

He sido bastante extenso en esta disidencia, pero no podía hacerlo de otro modo, ante la categoría y envergadura del problema en este caso. La ciencia, el derecho y la justicia dicen a mi conociencia que este caso debe ser revocado y dictarse sentencia declarando sin lugar la petición de hábeas corpus radicada. [68]

---

[67] Véanse: Dr. M. Porot; *ob. cit.*, supra; Dr. M. Bergeron, *Psicología de la Primera Infancia;* traducción al español por Julio Moreno, del original en francés; Edit. Luis Miracle, S.A., Barcelona, España, 10a. ed., 1971; O. Spurgeon English y Gerald H. J. Pearson, el primero Doctor en Medicina y Profesor y Director del Departamento de Psiquiatría de la Facultad de Medicina y Hospital de Filadelfia; el segundo, Doctor en Medicina y Decano del Instituto "Asociación Para el Psicoanálisis de Filadelfia"; traducido del inglés por Domingo Manfreli Cano; Edit. Luis de Coralt, Barcelona, España (1959); con el título de *Problemas de la Conducta Humana;* Stuart M. Finch, *Fundamentals of Child Psychiatry;* traducción al español por Mario A. Marino; *Fundamento de Psiquiatría Infantil;* Edit. Psique, Buenos Aires, Argentina; E. R. Hilgard, de la Universidad de Stanford, Cal., tomo I; Edit. Morata, Madrid, España.

[68] En última instancia estaría conforme con la posición asumida por el Señor Juez Presidente en su voto explicativo (véase escolio 5, pág. 332)

---

de que por lo menos, se revoque la sentencia, y se devuelva el caso al
tribunal de instancia para la celebración de un nuevo juicio; donde ambas
partes tengan amplia oportunidad de presentar toda la prueba pertinente
y el juez tener todos los datos que le permitan penetrar al corazón de
todo el problema; y sin la premura con que el récord demuestra, que se
llevó este caso; y se oiga a la menor, cuya opinión debe considerarse
también en el caso.